In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-16-00312-CR
_____

JAMAIL WALLACE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. 14-19168

MEMORANDUM OPINION

On April 17, 2014, a Jefferson County Grand Jury indicted Jamail Wallace for the offense of aggravated robbery, a first degree felony. *See* Tex. Penal Code Ann. § 29.03(a)(2) (West 2011). The jury found Wallace guilty. Wallace elected to have the jury assess punishment prior to trial: Wallace was sentenced to twenty years. Wallace appeals his conviction. In five issues on appeal, Wallace argues: (1) the trial court erred in denying the motion to suppress identification testimony

because the pretrial identification procedures were impermissibly suggestive and led to irreparable misidentification; (2) the trial court erred in allowing the State's investigating officer to testify about his analysis of phone tower data when the officer was not an expert qualified to render those scientific opinions before the jury, and the opinions were detrimental to him and had an irreparable effect on the jury's verdict; (3) the trial court erred by denying his request for a charge to the jury on the factual issue of whether the witnesses' identification of him was the result of impermissibly suggestive pretrial identification procedures; (4) the trial court erred by admitting hearsay testimony by Latashi Henry before the jury, which was not proven to be co-conspirator statements, nor statements that were made in the furtherance of the conspiracy; and (5) the evidence was insufficient to support a finding of guilt. We affirm the trial court's judgment.

## Background

On the morning of February 17, 2014, the AT&T store on Dowlen Road in Beaumont was robbed. Four employees arrived for work and met in the parking lot to enter the building between 8:00 a.m. and 8:30 a.m. One of the four employees, F.V. [1], remained outside the building to smoke a cigarette while her three co-workers

---

[1] We use initials herein to identify the victims of this offense. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and

2

entered the building. The three employees unlocked the door and the security gate, but they noticed the alarm was not on, which was unusual. In keeping with company policy, and because the store was not yet open for business, the three employees locked the door behind them once they were inside the building. The employees proceeded towards the back of the store to the break room that was secured by a keypad lock. When they entered the break room, the employees noticed that money from a deposit was laying on the counter in the break room, which was also unusual. This was against company policy since deposits were to be prepared by two employees, and they did not observe anyone else in the building when they arrived.

Still outside of the building, F.V. decided to not finish her cigarette, and as she unlocked the door and entered the store, a man charged her from around the side of the building. From inside the store, F.V. attempted to pull the door closed and lock it while holding the handle, but the man jerked the door out of her hands and pointed a gun at her. He then forced her toward the back of the store.

At this point, Latashi Henry, a store manager, walked out of the conference room, which was also at the back of the store. The man told Henry to unlock the safe in the inventory room. The man did not accompany Henry to the inventory room,

---

with respect for the victim's dignity and privacy throughout the criminal justice process").

but she did as she was told. Henry was in the inventory room alone for thirty-nine seconds, but she did not trigger any of the three different alarms in that room, even though she had ample time to do so.

One of the other employees, T.R., heard a scream as she prepared to clock in in the break room. The door to the break room opened suddenly and T.R. saw a man standing with a gun to F.V.'s head. The man had his face partially covered, with only his eyes and nose visible. F.V. told the others they were being robbed, and the man told the employees that F.V.'s life depended upon how they responded.

The man grabbed all of the cash off of the counter in the break room and forced all of the women into the inventory room at gunpoint with Henry. The four employees found it odd that Henry was there because she was not scheduled to work that day. Moreover, Henry rarely arrived early. Her early entry and being alone were violations of company policy.

Once the safe opened after a three-minute timer delay, the man had Henry shove the additional cash into the bag he carried. Then, he walked out of the back door, triggering an alarm. One of the employees called 911, and the police arrived shortly thereafter. The women all provided written statements to the officers on the scene.

The case was assigned to Detective Lewallen of the Beaumont Police Department. Officers Gunn and Brinkmeyer, also both with the Beaumont Police Department, assisted Detective Lewallen in the investigation. Detective Lewallen testified he was suspicious upon receiving the report that a robbery had occurred in broad daylight as most robberies occur at night.

Later, Detective Lewallen and Officer Gunn met with the witnesses again, at which time they provided sworn statements of the events. The women were able to provide a detailed description of the perpetrator and his attire. However, none of the women admitted to knowing the identity of the perpetrator at either interview.

However, through the investigation, it was determined that on Mondays, the store routinely has more cash on hand than any other day of the week, because the cash from Friday, Saturday, and Sunday is on hand. Upon learning this information, Detective Lewallen became even more suspicious that it might have been an "inside job." He focused particularly on Henry since she was not scheduled to work at the time of the robbery and had performed tasks in violation of company policy, like preparing deposits alone. There were also discrepancies between what she told police initially and what the facts ultimately revealed.

During the time of the robbery, it was discovered that Henry was on a thirty-three minute phone call with Wallace. Both the robber and Henry were wearing

5

wireless headsets at the time the robbery occurred. Additionally, Henry would not allow police to examine her cellphone, and when they obtained a warrant to search her phone, they observed that a factory reset had been conducted on the device, which effectively cleared all of the data. Once it was discovered that Henry was on the phone with Wallace during the robbery, Henry was questioned about why she did not tell Wallace she was being robbed. According to detectives, Henry initially acted confused and denied the call's occurrence; but later, in trying to explain why she did not tell Wallace she was being robbed, she told detectives that Wallace told her he was asleep on the phone. Based upon his investigation, Detective Lewallen ultimately concluded Wallace and Henry were on the phone during the robbery, and that Henry aided Wallace in the robbery.

Officers conducted photo lineups, during which F.V. and T.R. identified Wallace by focusing on his eyes. The first picture presented to F.V., however, was not done as part of a lineup. On February 25, 2014, Officer Gunn returned to the store accompanied by another officer to obtain surveillance video. Upon arrival, the officer saw F.V. and wanted to check on her. While talking, F.V. showed Officer Gunn a photo on her phone of a man she believed was Henry's boyfriend. Officer Gunn responded by showing F.V. the Texas driver's license photograph of Wallace and telling F.V. that this was whom she believed was Henry's boyfriend. Officer

6

Gunn did not tell F.V. the man's name or that he was a suspect. But, immediately upon viewing the photo of Wallace, F.V. had a fierce, emotional reaction and exclaimed that he was the man who robbed them. F.V. was adamant that she recognized his eyes. F.V. further told police that if they would put together a lineup and show her only the eyes, she would be able to identify the robber. The photograph of Wallace was not shown to any other witnesses that day.

Soon after, Officer Gunn indicated she became concerned she had tainted the investigation by showing F.V. a photo of Wallace. Officer Gunn testified she was concerned enough that she called Detective Lewallen to apprise him of her concerns. Detective Lewallen testified that he did not believe Officer Gunn had tainted the investigation, but he was concerned that she showed F.V. a photo of Wallace and viewed it as a hurdle he had to overcome.

On March 6, 2014, Detective Lewallen put together another photo lineup, which included the same driver's license photo of Wallace shown to F.V., along with photos of five other individuals matching his general description. Prior to showing F.V. the photographs, Detective Lewallen covered each photograph with two pieces of paper. Detective Lewallen advised F.V. that the robber may or may not be included in the lineup, and she should not feel compelled to choose any particular photograph. Upon presenting each photo separately to F.V., Detective Lewallen slid

7

the pieces of paper apart, revealing only the eyes in the photograph. F.V. identified Wallace by his eyes with one hundred percent certainty. F.V. also had a very emotional reaction when viewing Wallace's photo during the lineup.

Two of the other witnesses, J.D. and T.R., were also asked to view the photo lineup. J.D. could not identify anyone. T.R. was shown the same photographs, uncovered. She covered everything but the eyes herself, using the same method Detective Lewallen utilized with F.V. T.R. identified Wallace with ninety percent certainty. However, several days after T.R. identified Wallace in the photo lineup, she called Officer Gunn and advised that a male co-worker at the AT&T store should be considered a suspect.

Prior to trial, Wallace filed a motion to suppress photographic identification, arguing the procedure was impermissibly suggestive and there was a substantial likelihood of misidentification. During pretrial, the trial court heard Wallace's motion to suppress. The motion generically said the procedure for the photo lineup was wrong, but did not provide a reason. The judge denied the suppression motion. The judge also denied Wallace's request for an article 38.23 instruction in the jury charge pertaining to the photo lineup.

**Issue One: Motion to Suppress Identification**

In his first issue, Wallace argues the trial court erred in denying his motion to suppress identification testimony, both pretrial and in-court. Wallace argues the pretrial identification procedures were impermissibly suggestive and lead to irreparable misidentification.

## A. Standard of Review

Because the determination of an issue of whether a photographic identification procedure was impermissibly suggestive does not turn on an evaluation of credibility and demeanor of witnesses for purposes of the *Guzman* categories, we review the mixed question of law and fact under a *de novo* standard. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). "The reviewing court should therefore consider the five *Biggers* factors, which are all issues of historical fact, deferentially in a light favorable to the trial court's ruling. The factors, viewed in this light, should then be weighed *de novo* against 'the corrupting effect' of the suggestive pretrial identification procedure." *Id.* at 773–74; *see also Neil v. Biggers*, 409 U.S. 188, 199 (1972)). We may consider testimony from the motion to suppress hearing and evidence adduced at trial when considering the identification. *See Webb v. State*, 760 S.W.2d 263, 272 & n.13 (Tex. Crim. App. 1988).

9

**B. Analysis**

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). The United States Supreme Court has developed a two-step analysis to determine the admissibility of in-court identifications: "1) whether the out-of-court identification procedure was impermissibly suggestive; and, if suggestive, 2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001) (citing *Simmons*, 390 U.S. at 384; *Barley*, 906 S.W.2d at 33).

The Supreme Court has enunciated non-exclusive factors to consider in a reliability analysis. *Biggers*, 409 U.S. at 199–200. The factors to be considered in this analysis are issues of historical fact, and as such, will be considered deferentially in a light most favorable to the trial court. *Loserth*, 963 S.W.2d at 773–74.

> The following five non-exclusive factors should be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation[;] and (5) the length of time between the crime and confrontation.

10

*Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999) (internal quotations omitted) (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Biggers*, 409 U.S. at 199). Reliability is the linchpin in determining the admissibility of the identification testimony. *Brathwaite*, 432 U.S. at 114; *Barley*, 906 S.W.2d at 34. If the facts in favor of reliability outweigh suggestiveness, then the identification is admissible. *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992). Appellant has the burden to show by clear and convincing evidence the identification has been irreparably tainted before we will reverse a conviction. *Id.*; *Barley*, 906 S.W.2d at 34.

The use of a single photograph for purposes of identification is generally disfavored. *See Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) (holding that showing complainant's wife a single photograph after she asked to see a picture of the man arrested for her husband's murder was impermissibly suggestive); *Bond v. State*, 29 S.W.3d 169, 172 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (concluding pretrial identification was impermissibly suggestive when police officer showed complainant single photograph faxed from police department while officer was at complainant's home investigating crime less than one hour after incident); *Wilkerson v. State*, 901 S.W.2d 778, 782 (Tex. App.—Beaumont 1995, no pet.) (noting that while use of a single photograph is suggestive, it does not necessarily

render identification testimony inadmissible per se). Nevertheless, even if a lineup is found to be impermissibly suggestive, that is not the end of the inquiry, as the court must also evaluate whether there was a substantial likelihood of irreparable misidentification. *Delk*, 855 S.W.2d at 706.

In the present case, even if we concede that showing F.V. a single photograph of Wallace eight days after the robbery and telling her the police suspected he was the boyfriend of Henry was impermissibly suggestive, that does not end our inquiry. *See id.*; *Wilkerson*, 901 S.W.2d at 782. We must also determine whether the indicators in favor of reliability outweigh the suggestiveness. *See Delk*, 855 S.W.2d at 706; *see also Brathwaite*, 432 U.S. at 114–16; *Biggers*, 409 U.S. at 199–200.

**1. The opportunity to view.** F.V. was in the robber's presence for several minutes within inches of him, as he held her at gunpoint. The robbery occurred in broad daylight, shortly before 8:30 a.m. Although the perpetrator had his face partially covered, his eyes and nose were uncovered. F.V. testified she recognized him by his eyes before trial, and during trial, she identified him by his eyes as well.

**2. The degree of attention.** F.V. was not a passing observer. Indeed, she was the primary victim; as such, she could be expected to pay attention to details. Moreover, F.V. paid careful enough attention to the perpetrator that she observed cracks in the face paint he applied and testified it looked like the paint had begun to

12

dry. T.R., another witness who identified Wallace, also indicated she paid special attention to his appearance.

**3. The accuracy of the description.** F.V. and the other witnesses provided descriptions to the police within minutes of the robbery. While their descriptions of the height of the perpetrator varied, their other testimonies were consistent. They described him as wearing a hoodie, black pants, black gloves, black leather dress shoes, face paint, red headphones, and something pulled up over part of his face. This information was provided to police before they had an opportunity to review the security footage, and it was consistent with the images caught on video of the suspect, which confirms the accuracy of their descriptions.

**4. The witnesses' level of certainty.** When shown the single photo of Wallace, F.V. expressed her certainty that he was the perpetrator as evidenced by her spontaneous emotional response. At the police photo array, F.V. identified Wallace with one hundred percent certainty just by examining his eyes. She also identified him with one hundred percent certainty in-court. T.R. identified Wallace with ninety percent certainty during the photo lineup. But, she would later call the police and suggest they look into another co-worker, which would certainly detract from her level of certainty in her identification.

**5. The time between the crime and the confrontation.** The single photo was shown to F.V. eight days after the robbery. The photo array viewed by F.V., J.D., and T.R. occurred less than one month after the robbery. The in-court identifications occurred approximately two and a half years after the robbery.

The great majority of these factors weigh in favor of the reliability of the witnesses' identification. *See Brathwaite*, 432 U.S. at 114–16; *Biggers*, 409 U.S. at 199–200; *Delk*, 855 S.W.2d at 706; *Wilkerson*, 901 S.W.2d at 782. Beyond this, the detective went to great lengths to cover the faces when the photo lineup at the police station was presented to F.V., the only witness to previously see a photo of Wallace. By doing so, the detective gave her an opportunity to only view the eyes, which was how she indicated she identified the robber. We conclude the photo lineup at the police station was not impermissibly suggestive.

While the showing of the single photo of Wallace to F.V. was arguably impermissibly suggestive, in examining the totality of the circumstances surrounding the identifications, we conclude that it is outweighed by the linchpin of reliability in this case. *See Brathwaite*, 432 U.S. at 114; *Barley*, 906 S.W.2d at 34. Wallace has not shown by clear and convincing evidence that the showing of a single photo, even if impermissibly suggestive, led to a substantial likelihood of irreparable misidentification that would thus taint the in-court identifications. *See Ibarra*, 11

14

S.W.3d at 195. Moreover, while Wallace repeatedly asserted at trial the photo lineups were not conducted in accordance with the law and Beaumont Police Department procedure, article 38.20 of the Code of Criminal Procedure explicitly states that this alone "does not bar the admission of eyewitness identification testimony in the courts of this state." *See* Tex. Code Crim. Proc. Ann. art. 38.20 § 5(b). (West Supp. 2017).[2]

The trial court did not err in denying Wallace's motion to suppress the pretrial and in-court identification testimony. We overrule issue one.

### Issue Two: Phone Tower Data Testimony

In his second issue, Wallace contends the trial court erred by allowing Detective Lewallen to testify as an expert regarding his analysis of phone tower data because the detective was not qualified as an expert.

### A. Standard of Review

"We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)). Trial courts are in the best position to resolve questions of

---

[2] We cite the current version of the statute, as the 2017 amendments did not affect section 5(b) of article 38.20. *See* Tex. Code. Crim. Proc. Ann. art. 38.20 § 5(b) (West Supp. 2017).

admissibility, therefore appellate courts will uphold a trial court's decision on admissibility as long as the decision is not outside the "zone of reasonable disagreement." *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 391.

## B. Analysis

In the present case, Wallace's trial counsel took Detective Lewallen on voir dire regarding his qualifications to discuss cell phone tower data. Detective Lewallen testified that his analysis would tell what cell towers a phone hit. Detective Lewallen indicated the process was not scientific, and the data was provided to him by the phone company. Detective Lewallen also testified during voir dire that he was not an expert in triangulation and that he could not pinpoint Wallace's exact location. Detective Lewallen indicated that all he did was type a GPS coordinate into a map and find the location of the nearest tower. The trial court noted that Detective Lewallen was not testifying as an expert and *Daubert*[3] would not apply. The trial court further pointed out that the detective's testimony was that "he puts in something and it just spits out what tower it was[,]" and that any person could do that. The court explained that Detective Lewallen was only testifying about facts and not triangulation, with which Detective Lewallen agreed. Wallace objected based on

---

[3] *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993).

16

Texas Rule of Evidence 702 and on the ground that Detective Lewallen was testifying as an expert. The judge overruled this objection.

Texas Rule of Evidence 702 governs the testimony of expert witnesses. *See* Tex. R. Evid. 702. However, in the present case, the trial court determined that the subject of Detective Lewallen's testimony was not that of an expert, and he was testifying about facts. Therefore, Detective Lewallen's opinions would be that of a lay person and governed by rule 701. *See* Tex. R. Evid. 701. Rule 701 provides that the opinion testimony of a witness who is not an expert is limited to one rationally based on the witness's perception and helpful to clearly understanding the witness's testimony or to determining a fact in issue. *Id.*

In front of the jury, Detective Lewallen testified regarding Wallace's general whereabouts during the robbery, and defense counsel again objected that it called for an expert opinion, which was overruled. Detective Lewallen testified that Wallace had a thirty-three minute phone call with Henry during the time of the robbery, and during that call, Wallace's phone was using a tower that was 1500 yards from the AT&T store. Detective Lewallen further indicated that Wallace's phone did not leave the general vicinity or transfer to another tower during that time period.

Wallace argues on appeal that *Robinson v. State* supports the proposition that the cell phone tower testimony was "acknowledged to be scientific evidence[.]"368

17

S.W.3d 588, 599–601 (Tex. App.—Austin 2012, pet. ref'd). However, the court in that case noted the process "involved reading and analyzing cell phone records based on a general understanding that cell phones connect to the nearest tower location when a call is placed[, and] *[t]he analysis is straightforward and not particularly complex.*" *Id.* at 601 (emphasis added). Moreover, although some of the officer's testimony in that case was similar to that of Detective Lewallen, the officer in *Robinson* testified further that he could pinpoint the defendant's location within a two-mile radius. *See id.* Detective Lewallen made no such claim here. In fact, he testified he could not pinpoint Wallace's exact location. Rather, Detective Lewallen simply testified Wallace's phone did not transfer to another tower that was located within a certain distance of the robbery location for the duration of the thirty-three minute phone call with Henry. Wallace overlooks our sister appellate court's ultimate conclusion that the trial court did not abuse its discretion in allowing the officer to testify regarding the cell phone tower data and analysis in that case. *See id.*

"The degree of education, training, or experience that a witness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify." *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006). In this case, Detective Lewallen testified he simply typed in a

GPS coordinate into a map and found where the cell tower was located. In a number of other cases, courts have allowed law enforcement officers with training and experience similar to Detective Lewallen's to offer similar testimony regarding cell tower data. *See Thompson v. State*, 425 S.W.3d 480, 488–89 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding no abuse of discretion when the trial court allowed an officer with forty hours of training to interpret phone records to testify as an expert when the technique used was not complex); *Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at *10 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op, not designated for publication) (concluding the trial court did not abuse its discretion in letting an officer testify as an expert to render an opinion on general location of defendant's cell phone around the time of robbery); *Patterson v. State*, No. 05-13-00450-CR, 2015 WL 2400809, at *9 (Tex. App.—Dallas May 19, 2015, pet. ref'd) (not designated for publication) (concluding the trial court did not abuse its discretion in allowing an officer to testify as an expert in interpretation of cell phone and cell tower data although the officer had little specific expertise since the process used was simple, forthright, and easily understood by the jury and the officer had substantial experience in law enforcement); *Saenz v. State*, No. 13-10-00216-CR, 2011 WL 578757, at *3 (Tex. App.—Corpus Christi Feb. 17, 2011, pet. ref'd) (mem. op., not designated for publication) (determining analysis of

19

cell phone records was relatively simple and four years as a police officer, a three-day course in phone tracking, and performing analysis on twelve prior occasions were sufficient qualifications, and because the analysis of cell phone records was relatively simple, the required degree of education, training, and experience was not extremely high).

Detective Lewallen's lay opinion testimony regarding the cell tower data and the fact that Wallace's phone remained connected to a tower near the AT&T store during the thirty-three minute call with Henry while the robbery occurred, was certainly relevant. *See* Tex. R. Evid. 401. Moreover, any opinion testimony by Detective Lewallen as a lay witness would have been helpful to clearly understanding his testimony or determining a fact at issue. *See* Tex. Rule Evid. 701. Accordingly, we cannot say the trial judge's decision to admit his testimony as lay opinion fell outside the "zone of reasonable disagreement." *See Cameron*, 241 S.W.3d at 19; *Montgomery*, 810 S.W.2d at 391. There was no objection made by Wallace to Detective Lewallen offering a lay opinion. *See* Tex. R. Evid. 701; Tex. R. App. P. 33.1(a)(1)(A).

We overrule issue two.

## Issue Three: Jury Charge

In his third issue, Wallace contends the trial court erred in denying his request for a charge to the jury on the issue of whether the witnesses' identification of him was the result of impermissibly suggestive pretrial identification procedures in violation of the United States Constitution and the Code of Criminal Procedure. During trial, Wallace submitted a requested jury instruction pursuant to article 38.23. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). Wallace argued that whether the photo identification was unduly suggestive was a question of fact. The court denied the requested instruction reasoning that whether the identification was unduly suggestive was a matter of law and article 38.23 only applies if there is a fact issue for the jury to resolve.

### A. Standard of Review

Our first step when we review allegations of charge error is to determine if error actually exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we find error in the court's charge to the jury, we must then determine if it resulted in sufficient harm to require reversal. *See id.* at 744. When an appellant preserved alleged charge error at trial, any harm is sufficient to require reversal. *See Gibson v. State*, 726 S.W.2d 129, 133 (Tex. Crim. App. 1987).

**B. Analysis**

Evidence obtained in violation of the laws or the Constitution of the United States or Texas may not be admitted in criminal cases. *See* Tex. Code Crim. Proc. Ann. art. 38.23. Specifically, the article provides that a jury instruction should be submitted if a fact issue is raised about whether such a violation occurred, and the requisite instruction directs the jury to disregard evidence it finds was obtained in violation of the Constitutions or the law. *Id.*; *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). In order for an appellant to be entitled to an article 38.23 instruction, "three predicates must be met: (1) the evidence heard by the jury must raise an issue of fact, (2) the evidence on that fact must be affirmatively contested, and (3) the contested factual issue must be material to the lawfulness of the challenged conduct." *Hamal*, 390 S.W.3d at 306.

Article 38.23 is only applicable if there is a disputed fact issue regarding the alleged violation. *Jones v. State*, 493 S.W.2d 933, 936 (Tex. Crim. App. 1973); *Poulos v. State*, 799 S.W.2d 769, 772 (Tex. App.—Houston [1st Dist.] 1990, no pet.). In *Hamal*, the Court of Criminal Appeals determined that the appellant was not entitled to the article 38.23 instruction because there was no dispute about what the law enforcement officer did in that case. 390 S.W.3d at 307. Such is the case here as well. With respect to the single photo being shown to the witness on February

22

25, 2014, the testimonies of F.V. and Officer Gunn are consistent. Additionally, the testimony adduced at trial was consistent with the video recording of the witnesses going through the photo lineup procedure. There was no dispute in evidence regarding what occurred pretrial with the photo identification procedures, and Wallace's objection to the photo lineup procedures as being impermissibly suggestive is a legal issue not a factual one. *See Poulos*, 799 S.W.2d at 772. Without a factual dispute, it is not error for the trial court to refuse an article 38.23 instruction. *Id.*; *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd).

Because there was no factual dispute as to how the evidence was obtained, the trial court did not err in refusing to provide the article 38.23 requested by Wallace. Accordingly, we overrule issue three. *See* Tex. Code Crim. Proc. 38.23(a); *see also Hamal*, 390 S.W.3d at 306; *Jones*, 493 S.W.2d at 936; *Withers*, 902 S.W.2d at 125; *Poulos* 799 S.W.2d at 772.

**Issue Four: Hearsay Testimony**

In issue four, Wallace complains the trial court erred by admitting hearsay statements of Henry which he asserts were not proven to be co-conspirator statements or statements made in furtherance of the conspiracy.

## A. Standard of Review

In reviewing the admission of testimony or evidence, we employ an abuse of discretion standard, as outlined in issue two above. *See Cameron*, 241 S.W.3d at 19; *Montgomery*, 810 S.W.2d at 391.

## B. Analysis

Wallace complains of testimony provided by J.D. and Detective Lewallen. Specifically, J.D. indicated in her testimony that she observed Henry and Wallace in the inventory room one night talking about a gate. At trial, defense counsel objected based on hearsay and the right to confront, which was overruled. Detective Lewallen testified at trial regarding the suspicions he had about the robbery being an inside job and how those suspicions were heightened based on the personal observations of other witnesses who testified at trial and the lack of truthful information Henry provided during the course of the investigation.

Hearsay is defined as a statement that the declarant does not make while testifying at the current trial or hearing, and the party offers the statement in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). None of the statements complained of by Wallace were offered "to prove the truth of the matter asserted[.]" *See id.* J.D.'s testimony was offered to prove Wallace's presence in the inventory room at the store prior to the robbery with Henry, not what was said. Moreover, the

24

testimony of Detective Lewallen regarding Henry's statements were to establish why his suspicions were heightened, not to establish the truth of what Henry said. Accordingly, the complained of testimony did not constitute hearsay. *See id.* We overrule issue four.

## Issue Five: Legal Sufficiency

In his fifth issue Wallace complains that the evidence was legally insufficient to support a finding of guilt.

### A. Standard of Review

We review a challenge to the sufficiency of the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979). We look to all evidence in the record, including admissible and inadmissible evidence, and direct and circumstantial evidence. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). The jury is the sole judge of the witnesses' credibility and weight to be given to their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). We defer to the jury's determinations of weight and credibility of the witnesses. *See Brooks*, 323 S.W.3d at 899–900. Juries may draw multiple reasonable inferences from facts so long as

each inference is supported by the evidence presented at trial. *Tate*, 500 S.W.3d at 413.

**B. Analysis**

Wallace argues that without the identification testimony and cell phone tower testimony, the evidence is insufficient to prove Wallace is guilty of the robbery. This is not a correct articulation of the law. As outlined above, we consider all evidence whether properly or improperly admitted. *See Dewberry*, 4 S.W.3d at 740.

At trial, multiple witnesses testified regarding the robbery. Two witnesses identified Wallace in a pretrial photo lineup and proceeded to identify him in court. The detective in charge of the case testified about all of the circumstances leading them to believe the robbery was an inside job and that Henry and Wallace were involved. This included the fact that the robbery occurred in broad daylight on a busy street, it occurred on a Monday morning when the store had the most cash on-hand, Henry was at the store when she was not scheduled to work, that Henry had left currency unattended in the break room and was preparing a deposit without another employee present, Henry was alone in the inventory room for an extended time and did not sound an alarm, Wallace and Henry were on the phone together the entire time the robbery took place but Henry never told Wallace the robbery was occurring, Henry refused to cooperate with police and her phone was erased before

26

a warrant was served to seize it, and Wallace's phone was connected to a tower near the AT&T store while the robbery occurred.

In viewing all of the evidence in the light most favorable to the verdict, we conclude the evidence was legally sufficient, and the jury was rationally justified in finding Wallace guilty beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 895. We overrule Wallace's fifth issue.

**Conclusion**

Based on our analysis above, we conclude the trial court did not err when it refused to suppress the identification evidence, both pretrial and during trial. We further determine that the trial court did not err in allowing the detective to testify regarding cell phone tower data and his analysis of that data. Additionally, we conclude the trial court did not err when it refused Wallace's requested 38.23 instruction. The hearsay statements Wallace complain of do not meet the definition of hearsay. Finally, we conclude the evidence in this case was legally sufficient to support the jury's verdict. The judgment of the trial court is affirmed.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 4, 2017
Opinion Delivered May 23, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.