**James R. THOMPSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–10–00398–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

March 1, 2012.

Discretionary Review Refused Aug. 22, 2012.

Danny Karl Easterling, Easterling & Easterling, P.C., Houston, TX, for Appellant.

Lisa G. Porter, Assistant District Attorney, Harris County Criminal Justice Center, Houston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and MASSENGALE.

## OPINION

MICHAEL MASSENGALE, Justice.

A jury found appellant James Russell Thompson guilty of murdering his former lover, Giselle Teapo, and sentenced him to life imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011) (establishing offense of murder). Thompson pleaded "true" to an enhancement paragraph which alleged a prior federal conviction for possession of cocaine with intent to distribute, and the judgment reflects an affirmative finding that a deadly weapon was used. Thompson raises four issues on appeal: (1) the evidence against him on the murder charge was wholly circumstantial and therefore legally insufficient; (2) the trial court abused its discretion when it admitted expert evidence regarding mobile phone records; (3) the trial court abused its discretion when it admitted evidence of an extraneous offense during the punishment phase, because the evidence did not show Thompson's culpability beyond a reasonable doubt; and (4) the evidence concerning the extraneous offense was legally insufficient. We affirm the judgment.

## Background

James Russell Thompson and Giselle Teapo lived together in Thompson's rental home with Teapo's minor children. The State presented evidence at trial that Thompson was obsessed with Teapo. A federal parole officer who monitored Thompson in connection with a prior conviction for dealing cocaine knew about the couple. He testified that Thompson was often frustrated and distraught about the relationship. Moreover, Teapo's daughter told an investigating officer that her mother was being stalked by Thompson. Teapo's work supervisor similarly testified that he had to change Teapo's extension number because Thompson called her workplace so much one day that it interfered with her duties.

Multiple witnesses corroborated an incident in which Thompson violently choked Teapo at their home. Officer D. Cannady responded to an early morning 911 call from the house. He arrived to find Teapo visibly upset, with blood smeared on her face and red marks around her neck. Teapo told Cannady that Thompson choked her until blood came out of her nose and mouth. He said he would kill her before she could be with another man. Teapo's sister testified that she received a contemporaneous phone call in which Teapo said

that Thompson had tried to kill her. When the sister arrived at Thompson's house, she saw the blood and bruising on Teapo. Four other witnesses also testified to having seen Teapo's injuries after the choking incident. Teapo and her children moved out of Thompson's house immediately afterwards.

Thompson's anger apparently related to Teapo's relationship with another man. D. Warren testified that he carried on a romantic relationship with Teapo while she was still cohabitating with Thompson. According to Warren, Teapo had accepted a marriage proposal from him. He also purchased a pickup truck for her use. Thompson apparently knew about Warren and once made a "disturbing" call to Warren's cell phone.

Over the weekend prior to her death, Teapo told multiple relatives that she had received hundreds of harassing calls from Thompson on her mobile phone. She informed her sister and daughter that she intended to report Thompson's harassment to his parole officer on Monday morning. According to Teapo's daughter, Teapo told Thompson about her intention of reporting him. Sunday night of that same weekend, Teapo's sister received a late phone call from Thompson saying that he had had his last conversation with Teapo.

On Monday morning, October 27, 2008, a "large, fair skin black man" was seen sitting in the driver's seat of a dark blue Dodge Intrepid parked on the street where Teapo's aunt lived and where Teapo was then staying with her children. Approximately one hour later, Teapo was shot to death in her aunt's driveway. A witness testified that she had just arrived home when she heard a woman's scream and shots fired. Upon darting outside, she saw a "tall" man "with dark skin" walking away from a parked truck toward a "dark" car. As she called 911, she peered out the window to see the dark-colored car return. She saw the man get out and walk back toward the truck, and the man fired more shots before driving off again.

Police, responding to the 911 call, arrived to discover Teapo's dead body hanging out of the door of Warren's pickup truck. She had been shot six times. A neighbor identified Thompson from a photo array as the man he had seen in the Dodge Intrepid before the shooting. Other testimony established that Thompson had recently purchased a blue Dodge Intrepid.

The State called R. Hicks of Boasso America to testify about Thompson's unusual behavior on the morning of the shooting. Ten days beforehand, Thompson had come to Boasso America in Channelview to apply for a job. A week after that, Hicks called Thompson to tell him to come to work at 8:30 a.m. the next Monday morning. Thompson was advised to wear work-appropriate clothing and steel-toe boots. At 8:29 a.m. Monday morning, the approximate time of the shooting, Thompson called Hicks from his mobile phone to say that he had been at the hospital with his grandchildren and that he would be running 30 to 45 minutes late. Hicks recalled that Thompson actually arrived at about 9:50 a.m. wearing a "very nice" pullover, which Hicks did not consider appropriate for the kind of work Thompson would do. Thompson used his mobile phone incessantly as Hicks filled out his paperwork. At about 11:00 a.m., during an orientation, Thompson left Hicks's office to take a call, and upon his return he said that he had to leave for a family emergency.

The State offered Thompson's mobile phone records into evidence. Officer M. Rome of the Houston Police Department reviewed the records produced by Cricket Communications, Thompson's mobile

phone service provider. According to Rome, who had been trained in interpreting such records, each entry indicated which antenna initially accepted a "communication event" from Thompson's phone. Rome testified that a mobile phone call usually routes through the geographically closest antenna, but that a call may sometimes get "push[ed] off" to another available tower nearby. Rome testified that Thompson's phone accessed several Cricket antennas near the crime scene in southwest Houston around the time of the shooting, and then, during the next 20 minutes, it accessed Cricket antennas along the route toward Thompson's apartment in northeast Houston.

The jury convicted Thompson of murder and sentenced him to life imprisonment. Thompson appeals from this conviction.

### Analysis

#### I. Sufficiency of the evidence

Thompson argues in his first issue that the evidence at trial was legally insufficient to convict him of murder, since the evidence was entirely circumstantial and depended upon "an impermissible stacking of inferences."

In assessing legal sufficiency, we determine whether, based on all of the evidence viewed in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim. App.2003). In applying the Jackson standard of review, an appellate court must defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the facts. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim. App.2007). An appellate court may not

reevaluate the weight and credibility of the record evidence and thereby substitute its own judgment for that of the fact finder. *Williams*, 235 S.W.3d at 750.

Thompson argues that none of the State's evidence directly links him to the murder and that the State's case rested wholly on circumstantial evidence that was too weak to prove his guilt beyond a reasonable doubt. He attacks various elements of the State's case, arguing that each piece requires too great of an inferential leap to arrive at an incriminating conclusion. The verdict depended, in Thompson's words, on an "impermissible stacking of inferences."

■ The Court of Criminal Appeals addressed a similar argument about inference stacking in *Hooper v. State*, 214 S.W.3d 9 (Tex.Crim.App.2007):

> [I]nference stacking has not been used in this Court's sufficiency of the evidence jurisprudence in over 50 years. In the distant past, this Court reversed numerous convictions because they were based upon stacking inferences, unsupported presumptions, or building presumptions upon presumptions. However, that practice was discontinued and is not a part of our modern sufficiency review. We have used the *Jackson v. Virginia* test for legal sufficiency review since it was enunciated by the U.S. Supreme Court in 1979.

*Hooper*, 214 S.W.3d at 15 (citations omitted). The Court of Criminal Appeals further admonished that

> [i]nference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using the language of inference stacking, courts of appeals should adhere to the *Jackson* standard and determine whether the necessary infer-

ences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.* at 16–17. Though most of the evidence in this case may be characterized as circumstantial, that label does not affect our review for legal sufficiency. "[C]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. Circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 14–15.

■ The jury heard evidence that Thompson and Teapo had a tumultuous, violent relationship, and that on one occasion Thompson choked Teapo while saying that he would kill her before she could be with another man. Teapo threatened to report Thompson's harassing phone calls to his parole officer, and she was killed on the morning that she told others she would contact the parole officer. One neighbor identified Thompson as the person sitting in a blue Dodge Intrepid near the murder scene an hour before the murder, and another neighbor saw a "dark skin" man shoot Teapo and then leave in a "dark" car. Thompson was supposed to start work at the time of the shooting, but instead he arrived over an hour later. Records showed that Thompson's mobile phone was located near the murder scene until the time of the shooting, and it then moved toward his residence on the other side of town.

A jury could rationally conclude beyond a reasonable doubt from this evidence that Thompson was the person who shot Teapo to death, and that he did so intentionally or knowingly, which is an act that constitutes murder. *See* TEX. PENAL CODE ANN. § 19.02(b) ("A person commits [murder] if he ... intentionally or knowingly causes the death of an individual. . . ."). Thus, the Jackson test of legal sufficiency is sat-

isfied. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89.

We overrule Thompson's first issue.

**II. Admissibility of expert testimony**

In his second issue, Thompson argues that the trial court erroneously admitted expert testimony regarding the interpretation of the Cricket phone records. Thompson argues, first, that the testimony was unhelpful in assisting the factfinder to determine a fact in issue—namely, Thompson's whereabouts around the time of Teapo's killing—and, second, that the State did not establish the expertise of its witness who interpreted the records for the jury.

■ The United States Supreme Court explained the importance of the trial court's gatekeeping function with respect to expert opinion testimony in *Daubert v. Merrell Dow Pharmaceuticals,. Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The Court of Criminal Appeals, even before *Daubert,* has required that, on request, a trial court must conduct a gatekeeping hearing outside the presence of the jury to determine whether expert evidence is sufficiently reliable and relevant to help the jury. *Coble v. State,* 330 S.W.3d 253, 273 (Tex.Crim.App.2010) (citing *Kelly v. State,* 824 S.W.2d 568, 572–73 (Tex.Crim.App.1992)). The requirement for a gatekeeping hearing is rooted in Rule of Evidence 702, which provides,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702; *Kelly,* 824 S.W.2d at 573. When expert evidence is challenged, a gatekeeping hearing is required before ad-

mitting the evidence, regardless of whether the expertise at issue is novel or well-established. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex.Crim.App.2000).

One threshold determination for the trial court at the gatekeeping hearing "is whether such testimony is helpful to the trier of fact." *Emerson v. State*, 880 S.W.2d 759, 763 (Tex.Crim.App.1994); *see* Tex.R. Evid. 702. In other words, "[i]f the trial judge determines that the proffered expert testimony is reliable (and thus probative and relevant), then she must next determine whether, on balance, that testimony might nevertheless be *un* helpful to the trier of fact for other reasons." *Kelly*, 824 S.W.2d at 572 (emphasis in original). "The evidence may be unhelpful, even though reliable, if its probative value is substantially outweighed by, e.g., the risk of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or the presentation of cumulative evidence." *Emerson*, 880 S.W.2d at 763 (citing Tex.R. Evid. 403).

Besides requiring that expert evidence be reliable, relevant, and helpful, Rule 702 additionally requires that a witness offering expert opinion testimony be qualified to do so by reason of his knowledge, skill, experience, training, or education. *See* Tex.R. Evid. 702. "Qualification is a two-step inquiry. A witness must first have a sufficient background in a particular field, and a trial judge must then determine whether that background goes to the matter on which the witness is to give an opinion." *Davis v. State*, 329 S.W.3d 798, 813 (Tex.Crim.App.2010). "Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case." *Id.* "The degree of education, training, or experience that a wit-

ness should have before he can qualify as an expert is directly related to the complexity of the field about which he proposes to testify. If the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience." *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex.Crim.App. 2006) (footnote omitted).

In this case, the trial court conducted a gatekeeping hearing outside the jury's presence to determine whether the Cricket phone records and accompanying expert testimony would be admitted. The Cricket records consist of computer-generated spreadsheets. Each horizontal row has cells containing data corresponding to respective column headings such as "Destination Number," "Dialed Number," "Caller ID," "Date," "Time," and "Duration." The State called Officer Rome to interpret the records. He testified that the records showed the times of "communication events" initiated by Thompson's phone, and that the records identified each antenna that handled a "communication event." The phone accessing a particular antenna would be "in the general area of that tower" and would try to "use the most nearby tower," but "not every time will it use the closest possible tower." Rome presented to the court several maps that he had prepared showing the times and locations of Cricket antennas that communicated with Thompson's phone on the day of the murder.

Rome also testified at the hearing as to his qualifications to interpret the Cricket records. He had been with the Houston Police Department for 20 years, and he had been assigned to its criminal intelligence division for approximately two years. Upon joining the division, he received 40 hours of training by another officer on how to legally obtain mobile

phone records and read them. He attended two days of training courses with a company that provides software for interpreting such phone records, and an additional "week's worth" of training on how to upload records to the company's system to obtain reports. Rome said he interpreted mobile phone records "on a daily basis" for the police department and that he could do it better than any other officer in the department. He admitted that he was not an engineer and could not comment on the science of cellular technology, but he maintained that he had "basic knowledge of how the cellular handset is going to communicate with the cellular networks and the cellular antennas...." He further testified that based on his training, he could review Cricket's records to determine which antenna was used by a given phone during a "communication event." Two other district courts in Texas had previously qualified Rome as an expert in the interpretation of mobile phone records.

Thompson objected at a pre-trial hearing that the State failed show that interpreting mobile phone records "is generally accepted scientific theory in the scientific community." He also argued that Rome's experience and qualifications did not rise to the level of an expert. The trial court was nevertheless satisfied that Officer Rome possessed a "skill" that permitted him to give expert testimony, even though he fell short of "purely an expert on some type of scientific theory," and it ruled that the State could call Rome as a witness. See Tex.R. Evid. 702.

A. Helpfulness

■ On appeal, Thompson argues that given the wide effective range of the antennas and the possibility that his mobile phone communications were pushed onto neighboring towers, the testimony based on records of mobile phone usage supports only "conjecture about the location where the call originated." Thompson stresses that the Cricket records did not reflect his precise location at any given time, and that Rome stated as much during the gatekeeping hearing. Therefore, Thompson argues, the Cricket phone records and Officer Rome's testimony would not "help the jury determine any fact at issue under indictment in this cause," so the trial court abused its discretion in admitting the evidence. Thompson does not challenge the notions that Cricket can determine which antenna received a signal from Thompson's phone for particular calls, or that such information correlates to fixed antenna locations. Thus, Thompson challenges the helpfulness of the phone-related evidence in understanding other evidence or determining facts in issue, rather than the evidence's reliability. See Tex.R. Evid. 702.

During the gatekeeping hearing, the trial court was required to determine whether the phone-related evidence would "assist the trier of fact to understand the evidence or to determine a fact in issue." See Tex.R. Evid. 702; Emerson, 880 S.W.2d at 763. The trial court implicitly found the evidence to be helpful when it ruled that Rome could testify about the Cricket phone records. See Green v. State, 934 S.W.2d 92, 104 (Tex.Crim.App. 1996) ("When ruling on the admissibility of evidence, the trial court implicitly makes findings of fact and conclusions of law."). Thus, the question is whether the trial court abused its discretion in admitting the phone-related evidence because it was unhelpful to the jury. See Mata v. State, 46 S.W.3d 902, 908 (Tex.Crim.App.2001).

■ The possibility that Thompson's mobile-phone communications could have in fact originated miles away from the antennas does not necessarily render the phone-related testimony unhelpful. Unhelpful expert evidence is that which cre-

ates risk of unfair prejudice, confuses the issues, misleads the jury, creates undue delay, or presents cumulative evidence. *See Emerson*, 880 S.W.2d at 763. Helpful expert evidence is that which will assist the trier of fact to determine a fact in issue. *See* TEX.R. EVID. 702. Thompson's location at the time that Teapo was killed was a "fact in issue" for the jury. The evidence showed that Thompson's mobile phone was active in the general vicinity of the murder scene, a location close to neither his home nor his employment, and that after the murder the phone communicated with antennas while travelling along the way to the vicinity of Thompson's residence. Thus, the trial court did not abuse its discretion to the extent that it determined that Officer Rome's testimony and the Cricket records would be helpful to the trier of fact for the purposes of Rule 702. *See Joiner v. State*, 825 S.W.2d 701, 708 (Tex.Crim.App.1992).

### B. Qualifications

■ Next, Thompson argues that the State did not adequately show Officer Rome's qualifications to testify as an expert. Thompson points out that according to Rome's own testimony, he was not trained to interpret mobile phone records with scientific articles or other manuals, he did not know the "error rate" for interpreting such phone records, he had been practicing his expertise for only four months before applying it to Thompson's case, and he had testified about such evidence on only two prior occasions.

The State had to show at the gatekeeping hearing that Officer Rome had a "sufficient background" in interpreting mobile phone records to have him qualified as an expert. *Davis*, 329 S.W.3d at 813. The sufficiency of the witness's background is measured according to the complexity of the technique of interpreting mobile phone records. *See Rodgers*, 205 S.W.3d at 528.

The complexity of the technique employed in this case to interpret the records is not great—Rome only needed to know how the records were produced and what the data in each column signified. Rome testified that he had received forty hours of training on how to obtain and read the records from each mobile phone company operating in Houston. Cricket provided a list of the locations of its antennas, which permitted Rome to represent on a map the antennas that corresponded to entries in Thompson's phone records.

Given the relative simplicity of the technique of interpreting phone records employed in this case and Rome's training in that regard, we cannot conclude that the trial court abused its discretion when it qualified him as an expert in interpreting mobile phone records. Other courts of appeals have found that witnesses with similar training and experience were properly qualified under Rule 702 to interpret phone records. *See Saenz v. State*, No. 13–10–00216–CR, 2011 WL 578757, at *3 (Tex.App.-Corpus Christi Feb. 17, 2011, pet. ref'd) (mem. op., not designated for publication) (finding that three-day course on cellular phone tracking and twelve prior occasions performing such analyses were sufficient training and experience to qualify officer to interpret phone records); *Wilson v. State*, 195 S.W.3d 193, 200–02 (Tex. App.-San Antonio 2006, no pet.) (finding that testimony of cellular company employee who had general understanding of cellular phone technology and who frequently performed record analyses was properly admitted).

Officer Rome's testimony was helpful in determining a fact in issue, and the trial court appropriately qualified him as an expert in interpreting mobile phone records. Therefore, the trial court did not abuse its discretion in allowing Officer Rome to testify.

We overrule Thompson's second issue.

### III. Admissibility of arson-related evidence

 In his third issue, Thompson challenges the admission of evidence regarding an extraneous arson during the punishment phase. Thompson argues that the trial court erred because the evidence did not show beyond a reasonable doubt that he was culpable for that alleged arson. *See* TEX. PENAL CODE ANN. § 28.02(a) (West 2011) (elements of arson). Section 3(a) of Article 37.07 of the Code of Criminal Procedure governs the admissibility of evidence during the punishment stage of noncapital criminal trials. *Sierra v. State*, 266 S.W.3d 72, 79 (Tex.App.-Houston [1st Dist.] 2008, pet. ref'd). It provides that:

> evidence may be offered by the state ... as to any matter the court deems relevant to sentencing, including ... evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West 2011). However,

> this express authority of the trial court to admit evidence of any extraneous offense it deems relevant to sentencing is not unconditional.... Unless the extraneous misconduct evidence is such that the sentencing entity (either judge or jury) can rationally find the defendant criminally responsible for the extraneous misconduct, the trial court is not permitted to admit it at a punishment hearing.

*Smith v. State*, 227 S.W.3d 753, 759–60 (Tex.Crim.App.2007). Thus, the test of admissibility for such evidence is whether the State has presented sufficient proof that "the sentencing entity (either judge or jury) can rationally find the defendant criminally responsible for the extraneous misconduct." *Id.* at 759–60. We review a trial court's decision to admit evidence of an extraneous offense or bad act during the punishment phase under an abuse-of-discretion standard. *Lamb v. State*, 186 S.W.3d 136, 141 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

 The trial court held a hearing outside the jury's presence on the admissibility of the arson-related evidence. At that hearing, the State called two arson investigators with the Houston Fire Department, L. Dale and P. Aranda. Dale testified that he and Aranda were called to Thompson's rental house approximately one month before Teapo's death to investigate a possible arson. The burn patterns led Dale to conclude that a fire had started with "paper, trash" or the like on the floor of the master bedroom closet. Testimony elicited during the guilt phase of the trial established that there was a blood stain on the carpet of the same closet following the choking incident, which took place two days before the fire. Dale further stated that the front door of the house had been broken down by the fire department because it was locked. Aranda testified that Thompson told him that he had just changed the locks on the door and that nobody else had a key. Ruling out accidental causes, Dale and Aranda concluded that the fire had been intentionally set.

After Dale and Aranda finished testifying at the pre-punishment hearing, the State informed the court that Officer Rome was also available to testify that, based on the mobile phone records, Thompson was in the vicinity of his house around the time that the fire started. Although Rome later testified at the punishment phase in front of the jury, he did not

testify during the hearing on the admissibility of the arson-related evidence.

At the close of the hearing, Thompson argued that the court as the "gatekeeper" under Article 37.07 should not admit the arson-related evidence, since it would not allow a jury to conclude beyond a reasonable doubt that Thompson was responsible for setting the fire. The State responded that the evidence was admissible, and that the jury would be left to decide whether the arson was proven beyond a reasonable doubt. The court found that the State had proven beyond a reasonable doubt, to the court's satisfaction, "a circumstantial case" that Thompson committed the arson, and it ruled that the arson-related evidence could be presented to the jury.

The hearing testimony of Dale and Aranda showed that (1) in their professional opinion, the fire was started intentionally because accidental causes were ruled out, (2) the front door to Thompson's house was locked when the fire department arrived, and (3) Thompson told Aranda that he had just changed the locks and had the only key. A jury presented with this evidence could rationally conclude beyond a reasonable doubt that Thompson committed the arson, because he had exclusive access to a house in which an intentional fire had been set. *See* Tex. Penal Code Ann. § 28.02(a). Therefore, the trial court did not abuse its discretion in admitting the arson-related evidence at the punishment phase.

We overrule Thompson's third issue.

## IV. Sufficiency of arson-related evidence

In his fourth and final issue, Thompson argues that the evidence on the extraneous arson was insufficient under the *Jackson v. Virginia* standard of sufficiency of the evidence to prove Thompson's culpability. However, "we do not review the sufficiency of the evidence of an extraneous offense to support the jury's assessment of punishment." *Thompson v. State*, 4 S.W.3d 884, 886 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *accord Malpica v. State*, 108 S.W.3d 374, 378–79 (Tex.App.-Tyler 2003, pet. ref'd); *Ulloa v. State*, No. 14–10–00161–CR, 2011 WL 2462193, at *3 (Tex.App.-Houston [14th Dist.] June 21, 2011, no pet.) (mem. op., not designated for publication).

Before the jury or judge assessing the defendant's punishment may rely on evidence of an extraneous crime or bad act, the jury or judge must conclude beyond a reasonable doubt that the defendant committed or could be held criminally responsible for the extraneous crime or bad act. *See* Tex.Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). However, unlike a determination of guilt on the underlying offense, which must be supported by legally sufficient evidence under the Jackson standard, the burden applicable to evidence of extraneous offenses or bad acts during the sentencing phase of a non-capital trial "does not require the offering party to necessarily prove that the act was a criminal act or that the defendant committed a crime." *Haley v. State*, 173 S.W.3d 510, 515 (Tex.Crim.App.2005). Instead, to satisfy the procedural standard for evidence of extraneous offenses or bad acts, the proponent need only demonstrate "a defendant's involvement in the act itself, instead of the elements of a crime necessary for a finding of guilt." *Id.*

"[T]he question at punishment is not whether the defendant has committed a crime, but instead what sentence should be assessed." *Id.* Once the admissibility of an extraneous offense or bad act has been established, the jury or judge may rely upon the evidence in assessing punishment as long as the jury or judge concludes beyond a reasonable doubt that

the defendant was involved in the act, and the sentence may not be challenged on the basis that the evidence did not rise to the level to establish an independent statutory crime. *See id.; Thompson,* 4 S.W.3d at 886. Accordingly, we overrule Thompson's fourth issue.

## Conclusion

We affirm the judgment of the trial court.