**Opinion issued August 7, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-01016-CR

————————————

## DANE EDWARD WEATHERFORD, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1482268**

---

## MEMORANDUM OPINION

A jury found appellant, Dane Edward Weatherford, guilty of the offense of sexual assault of a child and assessed his punishment at fifteen years' confinement.[1] In three issues, appellant argues that the trial court abused its

---

[1]    *See* TEX. PENAL CODE ANN. § 22.011 (West Supp. 2017).

discretion in: (1) admitting the complainant's medical records; (2) admitting certain testimony from appellant's wife; and (3) failing to perform its gate-keeping function during sentencing as to extraneous pornography allegations. We affirm.

## Background

Appellant met his wife, Tobi, while they were both serving in the military. After leaving the military, appellant taught an ROTC class at North Forest High School, and Tobi worked at a local store. The couple had three children and had discussed adopting another child.

The complainant, "Jane," [2] was fourteen years old and in foster care when she met appellant through the ROTC program where appellant worked. Tobi testified that "probably within the first week that [Jane] was assigned to [appellant's] class, he came home and told [his teenage son, "Dan,"] that he found the perfect girlfriend for him." Tobi further testified that, a few weeks later, appellant told her that he wanted to adopt Jane. Tobi "questioned it a little" because she "didn't think we were going to adopt a teenager." However, appellant told her that he had "already promised [Jane] that [he] was going to adopt her," so Tobi felt that she had "almost no choice."

Tobi testified that, once she was able to spend time with Jane, she believed that the girl was a "good fit" for the family, and the couple adopted Jane in October

---

[2] We have changed the minors' names in order to protect their identity.

2014. Meanwhile, Jane had a sexual relationship with Dan, her adoptive brother. In the spring of 2015, Jane became pregnant by Dan and had an abortion. Approximately a week before the abortion took place, Jane attempted suicide.

Tobi also testified regarding appellant's behavior toward Jane. Tobi stated that he paid more attention to Jane than he did to the other children. In August 2015, she related to Jane's therapist her suspicions that something inappropriate was happening between appellant and Jane. The therapist contacted Child Protective Services, which investigated the claim. Tobi told the CPS investigator that she had not witnessed any sexually inappropriate behavior, and CPS eventually ruled out the concerns of sexually inappropriate conduct and closed its investigation. Tobi then related to Jane's therapist that she was not concerned for Jane's safety.

Jane testified that she was living in foster care when she met appellant through the ROTC program and he asked her if she would like to be adopted. She testified that she and appellant exchanged text messages frequently and that appellant frequently bought her gifts. She also stated that appellant insisted on tucking her in at night and would rub her back and stomach.

Regarding the events surrounding her suicide attempt, Jane testified that she had tried to commit suicide because appellant "was forcing [her] into an abortion." She testified that appellant had first forced her to have sex with him before her

3

pregnancy and that he had raped her multiple times. She testified that she did not tell anyone about the assaults because she did not think Tobi would believe her, and she did not want to break up the family or cause them all to lose their home.

On September 19, 2015, appellant caught Jane leaving Dan's room naked. Appellant became angry, and Jane threatened to tell Tobi about appellant's sexual assaults. Appellant then became suicidal. Jane testified that when Tobi got home that day, she told her about appellant's having forced her to have sex.

Tobi testified that, on September 19, 2015, her youngest son called her, asking that she come home immediately. Upon arriving home, she spoke with Jane, and then found appellant in the shower holding a firearm. He was stating that "he was a monster and that he deserved to die," but he did not explain any further. Tobi testified that appellant asked her to shoot him, then he "dry fired" the firearm at himself. Appellant then left the shower and sat against the wall in the closet.

Tobi stated that, during her confrontation with appellant, their oldest daughter came home, "found out what was going on and called [appellant's] Aunt Deborah." When asked why they called Aunt Deborah, Tobi explained that Deborah "has a master's in psychology and she's very caring." The State's questioning continued:

[the State]: So—and what was the purpose for you-all calling her?

[Tobi]: When she had visited in May, I had originally disclosed to her.

[Appellant]: Your Honor, I'm going to object to the statement from Ms. Weatherford to Aunt Deborah or anything Aunt Deborah said to—

[Court]: Sustained as to the hearsay portion as to Aunt Deborah.

[the State]: What did you tell Aunt Deborah?

[Appellant]: Same objection, Judge.

[Court]: Overruled.

[Tobi]: I had told her about my concerns about [appellant's] behavior and his behavior towards [Jane] and things that had been happening that I observed and told her my concerns and that I was starting to think that maybe I was crazy, and she told me I wasn't at that time, which is what eventually led me to talk to Denise, [Jane's] therapist.

Tobi then testified that appellant eventually left the home, and Tobi called the police. Appellant was arrested when he returned to the home the next day. Following appellant's arrest, Tobi sought help for Jane, including taking her for a sexual assault assessment.

The State offered Jane's medical records from The Children's Assessment Center into evidence at the conclusion of its case-in-chief. Appellant's counsel stated that he objected to this evidence on multiple grounds: "Generally my objection would be, No. 1, the doctor's not here to give the full testimony. More importantly there's a lot of hearsay that's not necessarily for medical diagnosis." The trial court decided to "conditionally admit" the records, stating, "then you-all can go through it. If there are any redactions that you would like to agree to, I'll

5

allow you to redact it this evening. Don't publish it to the jury until the appropriate redactions have been made." The next day, the trial court set out on the record the various redactions to the medical records agreed to by the parties, specifically noting that it had sustained appellant's objection regarding the physician's notation that "16-year-old girl gave clear history of gen-gen penetration chronic by [appellant]." The remainder of the medical records—Jane's sexual history, including her abortion and the number of partners, her suicide attempt, her answers to the physician's questions about the nature of the assault for which she sought treatment, the results of tests and a physical exam, and the physician's recommendations for Jane's treatment—were admitted into evidence.

Appellant's counsel stated that he had additional objections, stating, "I've written 'hearsay' next to what I think is hearsay. I've written 'relevance' [next] to what I think would be irrelevant. I would just ask that that be used to preserve the record. Since we're outside the presence of the jury, I will not make any further objections." The exhibit was marked with hearsay and relevance objections covering a significant portion of the medical records. The trial court entered the exhibit into the record but did not make any further rulings after appellant's counsel tendered the redactions.

The jury found appellant guilty, and the trial proceeded into the punishment phase. At the start of the punishment phase, the State called Jane's biological

6

mother to testify regarding Jane's early life and the circumstances surrounding Jane's ending up in foster care. She also testified that, due to Jane's experiences early in her life, Jane was afraid of disrupting another family by complaining about appellant's conduct toward her. The State also reoffered all of its exhibits from the guilt-innocence phase and rested.

Appellant's counsel introduced testimony from some of appellant's other ROTC students and a fellow instructor, who testified that appellant was a good and supportive mentor and had a good reputation among the other students. Appellant's counsel also introduced testimony regarding appellant's military service. Finally, appellant presented the testimony of a clinical psychologist who worked at the Harris County Jail and testified that appellant voluntarily participated in and successfully completed various therapy programs at the jail.

During a recess, outside the presence of the jury, the trial court and the parties discussed the State's intention to introduce rebuttal evidence during the punishment phase. The trial court discussed with the parties the notices that the State had provided to appellant. These included, in relevant part, a supplemental notice that the State intended to use extraneous offense evidence "for impeachment and/or punishment," which described the extraneous evidence as including "[t]he Defendant's computer, laptop, [and] back up tapes" that "were found to contain . . . videos and images of pornography," including "images both real and animated [of]

pre-pubescent females engaging in sexual activity" and videos and images "depicting incestual [sic] pornography."

The following discussion occurred between the trial court and appellant's counsel:

[counsel]: Whenever we get to the pornography portion, I have asked the analyst if he has—I was given a disk at some point, thousands of pages, it has many images. I believe the ones they have back there are temporary internet files from 2011 to 2012. Much of it was from when [appellant] was deployed. So, I would ask for a gatekeeping function on those because the images aren't good to see whether not, No. 1, they're overly prejudicial, if they're relevant. Is there any way to prove that these are [appellant's] or someone else['s] in the house, there [were] teenagers in the house?

[Court]: With regards to—you're asking me to—you're asking me to determine, like, the questions you just asked me, the credibility of the evidence, and that is not my function as a gatekeeper. Now that being said, I will give the jury a limiting instruction regarding extraneous offenses that are admitted at the punishment phase of a trial so that they can perform their function and determine the credibility of that evidence before they make a decision as to whether or not to consider it.

[counsel]: I guess my only concern is it's my understanding . . . that we're supposed to have some sort of a gatekeeping function to make sure it's possible the jury can believe whatever the bad act is beyond a reasonable doubt. And that's simply what I'm asking for before we ring this bell, I'd ask that you at least look into that. When were the pictures? How do we know that they're [appellant's], this type of thing? . . . He was in a submarine.

[Court]: Did they have internet access?

[counsel]:     Not to this computer. It's our understanding this is a home computer. At the time it was in the den in San Diego, if it's indeed the pictures we think they are. That's our concern.

[Court]:       You'll have an opportunity to cross-examine those witnesses. Are both sides ready for the jury?

The State then presented its rebuttal evidence to the jury, starting with the testimony of appellant's oldest biological daughter. She testified regarding the nature of her relationship with her father—that she loved him, but they were not very close and had had problems over the years—and the hardship his assault of Jane had caused in their family. A former ROTC student of appellant's testified that she, like Jane, had been in foster care, that appellant had expressed an interest in adopting her, and that he had touched her breast while she was visiting his home. She testified that she was never adopted by appellant's family and now has a child of her own.

Tobi testified again, this time referencing the fact that appellant had admitted to watching pornography. She stated:

[Tobi]:        It was probably a couple of weeks [after] the comment he made about porn that he'd been watching [that] was in the back of my mind, it just kept coming back up. And I did something I don't normally do. I looked at his computer, and I looked at his browser history.

[counsel]:     Your Honor, I would renew my previous objections to this.

[Court]:       All right. Overruled.

9

Tobi identified the desktop CPU and laptop entered into evidence by the State as belonging to appellant, and she testified that she had turned the laptop and CPU from the desktop over to the detectives after appellant's arrest. She testified that when she searched his computer herself, she "found multiple searches for incest porn on his search history." Tobi testified that she asked appellant "how he could possibly be looking at things like that. And he told me it was—none of it was real. It was just things that he happened to be watching, and the reason he was watching those particular videos was that those were the only ones that had attractive females in it." Tobi also clarified that, when she confronted appellant about the pornography, he did not try to blame the searches for the images on anyone else in the house, and he admitted that he had looked for those images. Tobi also testified regarding appellant's access to the computers. He was deployed during some of the relevant time, but he also had duties that allowed him to be home more. She also stated that he used his laptop "on the go."

Finally, the State called a computer forensic examiner for the Federal Bureau of Investigation, and the following bench conference occurred between appellant's counsel and the trial court:

[counsel]:    Two quick issues, my request to have a voir dire outside the presence of the jury is denied at this time?

[Court]:      Based on your earlier—

[counsel]:    Yes, ma'am. Just wanting to make sure.

10

[Court]:     Yes.

The expert testified regarding documents recovered from appellant's desktop computer that contained pornographic images. When the State offered these images into evidence, appellant's counsel stated, "In addition to the objections I made earlier, I just have an unduly prejudicial objection and not relevant at this time." The trial court overruled the objections and admitted the exhibits.

On cross-examination, appellant's attorney questioned the forensic computer examiner regarding the images that he had flagged in his search of appellant's computer. The forensic examiner agreed that all of the images had come from temporary internet files, which were created automatically while the user browsed the internet. Thus, the images were not necessarily "stand-alone image[s] on a web page," but could be "one of a series in a banner" or on "the side or anywhere on that web page." The forensic examiner also stated that the flagged images that were admitted into evidence were dated from either May 23, 2011, or May 25, 2011. The examiner testified that he could not determine who had accessed the web pages.

The jury assessed appellant's punishment at fifteen years' confinement. This appeal followed.

11

**Admission of Evidence During Guilt-Innocence Phase**

In his first two issues, appellant argues that the trial court erred in admitting Jane's medical records and Tobi's testimony that she had expressed her concerns about appellant and Jane to appellant's aunt.

**A.    Standard of Review**

We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). An abuse of discretion occurs when the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). We will not reverse a trial court's ruling unless it is so clearly wrong that it "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83. We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93.

**B.    Admission of Jane's Medical Records**

In his first issue, appellant argues that the trial court erred in admitting Jane's medical records. He argues that the records were not properly authenticated,

but appellant did not raise a complaint regarding the authentication of these documents at trial.[3]

To preserve error, a party must timely object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1)(A); *see Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016); *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). The objection must be sufficiently clear to give the judge and opposing counsel an opportunity to address and, if necessary, correct the purported error. *Thomas*, 505 S.W.3d at 924; *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009); *see Smith v. State*, 499 S.W.3d 1, 7–8 (Tex. Crim. App. 2016) ("There are two main purposes behind requiring a timely and specific objection. First, the judge needs to be sufficiently informed of the basis of the objection and at a time when he has the chance to rule on the issue at hand. Second, opposing counsel must have the chance to remove the objection or provide other testimony."). If a trial objection does not comport with arguments on appeal, error has not been preserved. *Thomas*, 505 S.W.3d at 924.

---

[3] Appellant states in his brief:

> The State did file written notice with the district clerk under Rule 902(10) of its intent to use business records with an accompanying affidavit as to the Complainant's records from the Children's Assessment Center (CAC). . . . However, this self-authenticating business records affidavit was not introduced at trial, and cannot be found in the Clerk's or Reporter's records in this case.

Appellant argues on appeal that Jane's "CAC medical records were hearsay and they were unauthenticated at trial, thus the trial court abused its discretion by admitting the record." However, at trial, appellant objected only on the basis of impermissible hearsay contained within the medical records and relevance. He did not assert at trial that the medical records were not authenticated, and thus he did not preserve this complaint for consideration on appeal. *See id.* (holding that trial objection must comport with arguments on appeal to preserve error).

Appellant initially objected at trial on multiple grounds, including that "the doctor's not here to give the full testimony" and "there's a lot of hearsay that's not necessarily for medical diagnosis." The trial court conditionally admitted the medical records, asking the parties to make redactions and then reassert any remaining objections. After the redacted document was presented to the trial court, appellant stated that he continued to object, submitting an annotated copy of Jane's medical records and stating, "I've written 'hearsay' next to what I think is hearsay."

Appellant does not present any argument on appeal comporting with his trial objection that certain statements contained in the medical records were impermissible hearsay. *See id.* On appeal, appellant argues generally that the statements in Jane's medical records were hearsay, but he does not provide a clear and concise argument, with citation to proper legal authority and the record,

14

identifying which statements, if any, constituted "hearsay that [was] not necessarily for medical diagnosis." Moreover, we observe that many statements in the medical records—such as the information regarding Jane's sexual history, her medical and mental health history, and the specific facts relevant to the assault for which she was seeking treatment—were pertinent to her medical treatment and, thus, were admissible under Rule of Evidence 803(4). *See* TEX. R. EVID. 803(4) (providing hearsay exception for statements made for purpose of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or inception or general character of cause or external source thereof, insofar as reasonably pertinent to diagnosis or treatment); *Bargas v. State*, 252 S.W.3d 876, 896 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("Because treatment of child abuse includes removing a child from an abusive setting, the identity of the abuser is pertinent to the medical treatment of the child. Hearsay statements by a suspected child victim of abuse regarding causation, source of abuse, or describing abusive acts are admissible under Rule 803(4) as being pertinent to the medical treatment of a victim.").

Thus, to the extent that we can consider appellant's general assertion on appeal that these records contain impermissible hearsay as an attempt to reassert his hearsay objections from trial, he has not adequately briefed this complaint or

15

demonstrated any error on the part of the trial court.[4] *See Mims v. State*, 238 S.W.3d 867, 874 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that complaint on appeal was waived where defendant failed to specifically identify statement he claimed was hearsay); *see also* TEX. R. APP. P. 38.1(i) (providing that appellant's brief must contain clear and concise argument for contentions made and appropriate citations to record).

We overrule appellant's first issue.

## C.    Admission of Tobi's Testimony

In his second issue, appellant argues that the trial court erred in admitting the following testimony by his wife, Tobi, over his objection on hearsay grounds:

> I had told [appellant's Aunt Deborah] about my concerns about [appellant's] behavior and his behavior towards [Jane] and things that had been happening that I observed and told her my concerns and that I was starting to think that maybe I was crazy, and she told me I wasn't at that time, which is what eventually led me to talk to Denise, [Jane's] therapist.

Appellant argues that this testimony constitutes improper hearsay in that it relates a previous out-of-court statement made by Tobi. Hearsay is an out-of-court statement offered for the truth of the matter asserted. TEX. R. EVID. 801(d); *see also Coronado v. State*, 351 S.W.3d 315, 326 (Tex. Crim. App. 2011) ("Both the

---

[4]    We also observe that appellant never obtained a ruling from the trial court after submitting the redacted copies of the medical records. *See* TEX. R. APP. P. 33.1(a) (providing that party complaining of error on appeal must generally demonstrate that it objected to error and that trial court ruled, or refused to rule, on objection).

federal and Texas hearsay rules apply to prior out-of-court statements made by a testifying witness."). The State argues, however, that Tobi's testimony about her prior conversation with appellant's aunt did not constitute hearsay because Tobi's statements were not out-of-court statements offered for the truth of the matter asserted, and we agree.

In the complained-of testimony, Tobi was testifying to the fact that she had expressed her concerns about appellant's conduct toward Jane to another person, but she did not relate the specific content of her previous statements to appellant's aunt. In context, this testimony was offered to explain why Tobi's oldest daughter made a phone call to the aunt after the confrontation on September 19, 2015, and to explain why the family did not immediately call the police. The purpose of this testimony was not to relate previous factual assertions about appellant's conduct, but to explain the events surrounding the day of the confrontation and to put Tobi's testimony into its proper context. The trial court could have reasonably concluded that Tobi's testimony was not relating an out-of-court statement offered for the truth of the matter asserted, and thus it did not abuse its discretion in admitting the testimony. *See* TEX. R. EVID. 801(d); *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("An extrajudicial statement or writing that is offered for the purpose of showing what was said, rather than for proving the truth of the matter stated therein, does not constitute hearsay.").

We overrule appellant's second issue.

## Performance of Gatekeeping Function During Punishment Phase

In his third issue, appellant complains that the trial court refused to perform its gatekeeper function when it allowed the State to present evidence during the punishment phase of "extraneous pornography allegations," including that appellant had viewed pornography in the past and that there was evidence of pornography viewing on a computer taken from appellant's home. Appellant specifically contends that "[t]he trial court refused to make an initial determination or perform its gatekeeping function as to this extraneous evidence," which included testimony regarding his viewing of pornography and images found on a computer of "incest pornography" depicting males engaging in sexually explicit conduct with younger women or girls. He further argues that the trial court failed to make a finding that the jury could rationally find beyond a reasonable doubt that appellant was "criminally responsible for the extraneous misconduct, or even that the extraneous acts were attributable to the appellant beyond a reasonable doubt."

### A.     Standard of Review

The Code of Criminal Procedure provides that

> evidence may be offered by the state . . . as to any matter the court deems relevant to sentencing, including . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

18

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West 2011); *Thompson v. State*, 425 S.W.3d 480, 490 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). The authority of the trial court to admit evidence of extraneous bad acts or misconduct during the punishment phase is not unconditional. *Thompson*, 425 S.W.3d at 490 (quoting *Smith v. State*, 227 S.W.3d 753, 759–60 (Tex. Crim. App. 2007)). "Unless the extraneous misconduct evidence is such that the sentencing entity (either judge or jury) can rationally find the defendant criminally responsible for the extraneous misconduct, the trial court is not permitted to admit it at a punishment hearing." *Id.* Thus, here, when the State offered evidence of appellant's extraneous bad act of possession of incest pornography, it was required to present evidence such that the jury could determine beyond a reasonable doubt that appellant had engaged in the extraneous bad act. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *Thompson*, 425 S.W.3d at 490.

The trial court must act as a gatekeeper to determine whether the evidence is admissible, while the jury "is to determine whether or not the State has proved the extraneous offenses beyond a reasonable doubt." *Mitchell v. State*, 931 S.W.2d 950, 953–54 (Tex. Crim. App. 1996) (plurality op.); *see Palomo v. State*, 352 S.W.3d 87, 91–92 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding that trial court decides threshold issue of admissibility and fact finder decides whether extraneous offense was proved beyond reasonable doubt). We review a trial court's

19

decision to admit evidence of an extraneous offense or bad act during the punishment phase under an abuse-of-discretion standard. *Thompson*, 425 S.W.3d at 490 (citing *Lamb v. State*, 186 S.W.3d 136, 141 (Tex. App.—Houston [1st Dist.] 2005, no pet.)).

**B.    Facts**

When appellant first objected in anticipation of the State's introduction of evidence regarding his viewing of pornography and asked the trial court to perform its "gatekeeping function," he stated that he had concerns regarding whether the images on the computer could actually be attributed to him. Thus, appellant asked the trial court to perform its "gatekeeping function" to determine whether the evidence was such that the jury could find him criminally responsible for the pornography in question beyond a reasonable doubt.

The record demonstrates that the trial court had before it the State's pretrial notices regarding the devices and specific images it wanted to admit, and the trial court replied:

> [T]he questions you just asked me [go to] the credibility of the evidence and that is not my function as a gatekeeper. Now that being said, I will give the jury a limiting instruction regarding extraneous offenses that are admitted at the punishment phase of a trial so that they can perform their function and determine the credibility of that evidence before they make a decision as to whether or not to consider it.

20

The trial court discussed the evidence briefly with the attorneys, asked whether appellant had access to the internet during the relevant time, and ultimately concluded that appellant's counsel would be able to cross-examine the witnesses. The trial court did not conduct a hearing or otherwise explore Tobi's anticipated testimony on the issue of appellant's pornography viewing or her testimony attributing the pornographic images taken from the computer to appellant's use of that device.

Subsequently, Tobi testified regarding her personal knowledge of appellant's viewing of pornography. Appellant again objected to this testimony, stating that he wished to "renew my previous objections to this," referring to his concerns that the images found on the computer could not be attributed to him. The trial court overruled the objection again.

When the State called the forensic computer examiner, appellant's counsel asked again "to have a voir dire outside the presence of the jury" based on his earlier arguments, which the trial court denied. Appellant also objected when the images themselves were offered into evidence, stating, "In addition to the objections I made earlier, I just have an unduly prejudicial objection and not relevant at this time." The trial court, again, overruled the objections and admitted the exhibits.

## C.  Threshold Determination of Admissibility and Harm Analysis

Appellant argues that the trial court erred in not holding a hearing prior to admitting pornography evidence, making a brief reference to Rule of Evidence 104. In relevant part, Rule 104(c) provides that a trial court "must conduct a hearing on a preliminary question so that the jury cannot hear it if: (1) the hearing involves the admissibility of a confession in a criminal case; (2) a defendant in a criminal case is a witness and so requests; or (3) justice so requires." TEX. R. EVID. 104(c). However, appellant provided no argument or citation to authority indicating that any of these grounds applied in this case. Thus, to the extent that appellant is attempting to argue that the trial court was required to hold a separate evidentiary hearing outside the presence of the jury under the provisions of this Rule, we conclude that the argument is waived. *See* TEX. R. APP. P. 33.1(a), 38.1(i)

Appellant also argues that the trial court erred in not making a proper threshold determination regarding the admissibility of the pornography evidence prior to Tobi's testimony. However, even if we assume, without deciding, that the trial court failed to make a proper threshold determination regarding the admissibility of this evidence prior to Tobi's testimony, the record indicates that appellant was not harmed by the trial court's permitting testimony and evidence on this topic.  Under Texas law, any non-constitutional error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.  *See* TEX. R.

22

APP. P. 44.2(b). Moreover, the Court of Criminal Appeals has held, in the context of a trial court's failure to hold a required gatekeeper hearing on admissibility of scientific evidence, that the failure to hold a hearing is harmless if the evidence was, in fact, reliable. *Jackson v. State*, 17 S.W.3d 664, 672 (Tex. Crim. App. 2000).

The record contained evidence from which the jury could have concluded beyond a reasonable doubt that appellant possessed and viewed pornography. At the gatekeeping stage before receiving Tobi's testimony, the trial court had before it information that appellant had had access to the internet during the relevant time, and the trial court determined that appellant's counsel would be able to cross-examine the witnesses. Subsequently, Tobi testified that appellant made a comment indicating that he had viewed pornography, so she looked on his computer and searched his browser history. When she confronted him about his searching for incest pornography, he did not deny that he had done so but stated that "none of it was real" and that "he was watching those particular videos [because they] were the only ones that had attractive females in [them]." Tobi also identified the computer examined by the forensic examiner and found to contain pornographic images. Tobi testified that the computer belonged to appellant, that he had used the laptop "on the go," and that appellant had had at least periodic access to the computer during the relevant time.

23

We conclude that the evidence of the extraneous pornography allegations was reliable and was such that the jury reasonably could have concluded that appellant had searched for and viewed the pornography as asserted. *See Wise v. State*, 364 S.W.3d 900, 907 (Tex. Crim. App. 2012) (holding that "[t]he jury could have reasonably inferred from appellant's possession of temporary internet files referring to 'young porn' and 'teen sex' that appellant knowingly and intentionally had possession of the other child pornography in the free space of his computer"); *Wilson v. State*, 419 S.W.3d 582, 590 (Tex. App.—San Antonio 2013, no pet.) (holding that evidence was sufficient to sustain conviction for possession of child pornography when images were found under defendant's profile and he admitted that he had viewed images). Appellant's counsel was permitted to cross-examine the witnesses regarding the exact nature of the evidence, and the trial court agreed to give the jury a limiting instruction regarding its ability to consider the pornography evidence.

We conclude that any error in the trial court's failing to make a preliminary gatekeeping determination on the admissibility of the extraneous pornography evidence did not affect any substantial right of appellant's. *See* Tex. R. App. P. 44.2(b). Accordingly, appellant was not harmed by the trial court's ruling admitting this evidence. *See* Tex. R. App. P. 44.2(b); *Jackson*, 17 S.W.3d at 672.

We overrule appellant's third issue.

24

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).