

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-23-00240-CR

---

Ronald Anthony Burgos-Aviles, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 49th District Court
Webb County, Texas
Trial Court No. 2018CRA000852D1

---

# OPINION[1]

Appellant Ronald Anthony Burgos-Aviles appeals his conviction on two counts of the capital murder of Grizelda Hernandez and D.A.H. Finding no error, we affirm.

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent they might conflict with our own. *See* Tex. R. App. P. 41.3.

# I. BACKGROUND

## A. Discovery of the murders

On April 9, 2018, Burgos-Aviles, a border patrol supervisor, was assigned to work from 6:00 a.m. to 4:00 p.m. in an area that included Father McNaboe Park in Laredo, Texas. At 11:18 a.m., he radioed a call for assistance, saying that he found an injured woman on a trail. Border Patrol agent Bradley Dennison arrived at the scene shortly afterwards. He saw that the victim was deceased and was lying in a large pool of blood. He testified that he decided to check the brush and area by the river to look for the perpetrator or any other victims. Dennison had 18 years' experience tracking individuals and testified that an area in the tall brush appeared that it had been pressed down, indicating "somebody was there for . . . an extensive period of time." He believed it was likely where the perpetrator had hidden "waiting [] in ambush." As he continued to investigate in the brush, he found another deceased victim—a young child—a stroller, and a shoe that matched a shoe on the trail next to the first victim.

According to other border patrol agents who were at the crime scene that day, Burgos-Aviles contaminated the scene and the evidence despite having received training in evidence preservation. For example, Agent Francisco Lara saw Burgos-Aviles pick up the victim's body. When later questioned, Burgos-Aviles admitted to moving the body but claimed to have done so to see if she was breathing. Lara also said that Burgos-Aviles picked up the shoe found in the brush and put it by the victim's feet. Lara and Dennison both testified that Burgos-Aviles was leaving prints by walking on the trail and scuffing his feet a few times in the dirt, destroying any prints already there. Burgos-Aviles also kicked and moved a rock that had blood splatter and was near the body.

Multiple officers from the Laredo Police Department soon arrived and as part of the investigation took written statements from the border patrol agents that were there. Burgos-Aviles asked a detective with the police department at least three times if they had been able to identify the victim. And, although cell phones belonging to the victim were later found in Burgos-Aviles's truck, he did not notify anyone at the scene that he had them.

Laredo Police Sergeant Gilberto Benavides testified that he followed the stroller tracks from the trail to a paved road that went to the parking lot. In the parking lot was a car with a child seat in the back and, believing it could be connected to the victims, Benavides ran the plates and learned that the owner was Angelica Hernandez. Benavides went to Angelica's address and, in speaking with her, learned that Anglica's sister, Grizelda, had borrowed her car. Angelica told Benavides that Grizelda took her son, D.A.H., to the park where she planned to meet with D.A.H.'s father, a border patrol agent named Anthony Burgos. He radioed that information to the officers at the crime scene. Burgos-Aviles was still on the scene and heard his name. He denied that Grizelda was an ex-girlfriend and was not forthcoming when asked his name.[2]

Once officers confirmed Burgos-Aviles's full name and Angelica confirmed that the victims were Grizelda and D.A.H., Laredo police officers detained Burgos-Aviles and placed him in a police vehicle to be transported to the station. Video of him in the car shows him appearing to lick his finger and wipe something off his arms. He was also heard saying "los telefonos" (the telephones), which the State argued was him remembering that he left the cell phones in his border patrol unit.

Grizelda's autopsy revealed that she had approximately 27 stab wounds, including to her neck where both carotid arteries were severed. She also had a subarachnoid hemorrhage from blunt

---

[2] The nametag on Burgos-Aviles's border patrol uniform was "R. Burgos." Angelica only knew him by his middle name, Anthony.

force trauma to her head. D.A.H. was stabbed in the chest and neck, also severing his carotid artery. The medical examiner testified that he believed the deaths were intentionally caused because of the number of wounds as well as the fact that the neck area was targeted.

### B. Burgos-Aviles's relationship with Grizelda

The murders exposed an extra-marital relationship between Burgos-Aviles and Grizelda. When Grizelda became pregnant, Burgos-Aviles did not want her to have the baby and told her that he wasn't living in Laredo. He was absent from their lives and did not help to financially support D.A.H. However, around February 2018, when D.A.H. was nearly a year and a half, Grizelda learned that Burgos-Aviles was not separated from his wife, as he had told her, and that he lived in Laredo. Grizelda, a nursing student, was relying on student loans to pay for day care and decided to apply for child support services. When Burgos-Aviles found out about the child support application, he was upset, and they argued about it. Only after that did Burgos-Aviles ask to meet D.A.H. for the first time.

### C. Investigation

Grizelda's phone and a phone used as a toy by D.A.H. were found in Burgos-Aviles's Border Patrol truck and both had blood on them. Blood was also found on the tailgate and on a belt keeper in Burgos-Aviles's truck. DNA testing showed that it was extremely probable that the blood was from D.A.H. and Grizelda.[3]

Surveillance video at the park showed Grizelda entering the park on the day of the murders at 9:09 a.m. During this same time, data from Burgos-Aviles and Grizelda's cell phones show that the phones were at or near the crime scene around 9:30 a.m., the estimated time of the murders,

---

[3] The foresenic scientist at Bexar County Crime lab testified that the probability that another individual would have the same genetic profile was 1 in 53 octillion.

left the park at 10:10 a.m., and travelled to the area of Burgos-Aviles's home, and then back to the park.

In addition to the data from the cell phones, GPS data from the Motorola radio in Burgos-Aviles truck confirmed this movement.[4] A home security video from Burgos-Aviles's neighbor's house showed that Burgos-Aviles arrived home at 10:27 a.m. not wearing his border patrol uniform and then left around ten minutes later.[5] Surveillance cameras from local businesses also captured video of Burgos-Aviles travelling along that route from home back to the park at that time.[6]

### D. D.A.H.'s leg injury

In addition to evidence about the murders, the State elicited testimony about an incident 15 days before the murders.

Once Burgos-Aviles learned that Grizelda had applied for child support, he asked to meet D.A.H. for the first time. Grizelda agreed and on March 25, 2018, they met at Winfield Park. Grizelda told her sister that while at the park, she went to the car for snacks and to give Burgos-Aviles time alone with D.A.H. When she returned, D.A.H. was crying and could not be soothed. She cut their meeting short and took D.A.H. home, but he continued to complain and cried when his leg was moved. Grizelda's sister, Angelica, is a nurse and examined D.A.H. She testified that she saw a "dot" of blood on his thigh and asked Grizelda if he had recently gotten any shots. Grizelda said he had not, so they believed that, since they had just been to the park, it was an insect bite.

---

[4] Burgos-Aviles's border patrol truck was equipped with Motorola radios that stored GPS location data each time he turned off the truck.

[5] Dennison testified that at the morning meeting, Burgos-Aviles was wearing his uniform.

[6] Burgos-Aviles's truck was distinguishable from other border patrol trucks out that day because it was one of only two that were equipped with a spotlight. The agents with the other similarly equipped truck were assigned to an area 20–50 miles away.

Grizelda took D.A.H. to the Emergency Room that afternoon. Grizelda told the doctors that the pain started when they were at the park and D.A.H. was discharged with instructions and medications for an allergic reaction from an insect bite. The pain, however, got worse, and D.A.H. was no longer able to walk. Grizelda took him to urgent care and his pediatrician, all of whom assumed based on what they had been told that the injury was an insect bite. D.A.H. could not walk after that day and had been scheduled to see a pediatric specialist on April 11, two days after he was killed.

Angelica testified that after the murders, she believed that D.A.H.'s leg injury was caused not by an insect bite, but a prior attempt to kill him. She contacted Corinne Stern, the medical examiner, who agreed to examine D.A.H.'s leg although the autopsy had already been done. Stern testified that she disagreed with the insect bite diagnosis and believed that D.A.H. was injected with something because only the tissue deep into the muscle was necrotic while, if it were an insect bite, the skin would also be necrotic. Stern called the hospital to ask for the blood sample that they had taken, but they no longer had it. She took a tissue sample, but they did not test it because they did not know what to test it for.[7]

Among Burgos-Aviles's belongings that were found during a search was a bag with hypodermic needles and a syringe. To explain why he had these items, Burgos-Aviles introduced into evidence medical records that showed that his doctor had prescribed testosterone by injection.

### E.  Verdict and appeal

The jury convicted Burgos-Aviles of two counts of capital murder, and he was sentenced to life imprisonment without the possibility of parole. On appeal, Burgos-Aviles argues that the trial court committed five errors: (1) discharging his initial second chair counsel; (2) denying his

---

[7] She explained that there were thousands of substances that they could test for, but without an idea of which to test for, the entire specimen could be consumed with testing.

motion to change venue; (3) admitting evidence of an extraneous offense; (4) denying his motion for mistrial; and (5) admitting location evidence obtained from his and Grizelda's cell phones.

## II. ANALYSIS

### A. The trial court did not err in discharging Burgos-Aviles's second chair attorney and appointing a new one.

#### (1) Appointment and discharge of attorney

In his first issue, Burgos-Aviles argues that the trial court erred in discharging one of his attorneys. Shortly after Burgos-Aviles was arrested, the magistrate appointed attorney Silverio Martinez to represent him. However, because Martinez did not have the qualifications to be appointed in a case in which the State seeks the death penalty, the trial court appointed Eduardo Pena, who did have such qualifications, as lead counsel. Tex. Code Crim. Proc. Ann. art. 26.052(d). After Martinez applied for and was approved for second chair appointments in death penalty cases, the trial court appointed him second chair.[8]

Approximately nine months later, Pena filed a motion[9] asking the trial court to remove Martinez and appoint another attorney in his stead. The motion and its attachments detailed increasing animosity between the attorneys. Pena alleged the following:

- Martinez took actions, such as filing discovery motions and setting hearings, without consulting Pena or obtaining his approval.

- Martinez "caused friction" between Pena and Burgos-Aviles by giving Burgos-Aviles incorrect information and unrealistic expectations. For example, Martinez allegedly told Burgos-Aviles that he would qualify for bond.

- Martinez gave a "conflicting assessment of the evidence" to Burgos-Aviles and his family, making it difficult for Pena to work with them on mitigation evidence. For example,

---

[8] In capital felony cases, the presiding judge is required to appoint two attorneys unless the State is not seeking the death penalty. Tex. Code Crim. Proc. Ann. art. 26.052(e).

[9] In the motion, Pena represented that it was filed on behalf of Burgos-Aviles, but Burgos-Aviles told the judge that he did not know about the motion or authorize its filing.

Martinez told Burgos-Aviles's father that they would be able to refute cell phone location evidence that showed that Burgos-Aviles had possession of Grizelda's cell phone for 40 minutes before he reported finding her and that Pena had already given up on defending Burgos-Aviles.

- Pena and Martinez did not agree on a strategy. According to Pena, Martinez wanted to pursue unsubstantiated theories of innocence and Pena wanted to focus on mitigation evidence (although he recognized a continuing duty to investigate evidence of guilt and innocence).

- Despite meetings and emails about the importance of a unified defense strategy, Martinez continued to explore what Pena considered to be "futile arguments" to refute forensic evidence and give Burgos-Aviles "false expectations."

- After yet another email where Pena admonished Martinez to follow his direction as lead counsel, Martinez responded to the defense team, "I'm not in the business of bending over for the DA [District Attorney] as soon as any 'bad' evidence comes up. You are—I get it."; "You seem to be more interested in avoiding 'ineffective assistance of counsel and reversible error than in winning the case for your client."; "I am convinced that you have been practicing for 50 years and bending over for the DA for 50 years!!!"; "I cannot work with you nor will I. If you ask your client, he hates you . . . I suggest they take you off before you send my client down the drain."

At an *ex parte*, in-chambers hearing, the court heard from both attorneys and Burgos-Aviles. Pena repeated the complaints made in the motion, that Martinez "create[ed] conflict" between him and Burgos-Aviles by "giving [Burgos-Aviles] a false assessment of the evidence" and telling Burgos-Aviles that Pena had "already decided that he's guilty[.]" He said that Martinez does not agree with his strategy decisions (such as his focus on mitigation evidence) or follow his direction as lead counsel. For his part, Martinez disputed Pena's accusations and questioned Pena's advocacy for his clients. He said that Pena stopped investigating the case before discovery was completed and that he was "very concerned about the fact that [Pena] is the only one that defends people that are facing the death penalty" because "he throws up his hands before discovery is fully

developed." Burgos-Aviles objected to the removal of Martinez, claiming that Pena did not communicate with him and was not preparing a defense.

At the conclusion of the hearing, the trial court explained to Burgos-Aviles that it believed that the ineffective working relationship between the attorneys would affect their ability to provide effective representation:

> The problem between both counsel is very evident. Okay. The record is replete with that. I can't have that. I can't have that. You can't have that . . . The problem is that they can't work together . . . So, it's not good for you. It's not good for your case . . . And it's up to me to make sure that those rights are protected.

The trial cort discharged Martinez and appointed William Boggs as second chair. Over the next year, Burgos-Aviles filed three pro se motions, asking that Pena be removed and Martinez be reinstated as his attorney.[10] At a pretrial hearing, the trial court denied Burgos-Aviles's motions.

### (2) Applicable law and standard of review

An indigent defendant is constitutionally entitled to appointed counsel, but not counsel of his or her choice. *Bluntson v. State*, No. AP-77,067, 2025 WL 1322702, at *23 (Tex. Crim. App. May 7, 2025). Nonetheless, "[o]nce counsel has been validly appointed to represent an indigent defendant and the parties enter into an attorney-client relationship it is no less inviolate than if counsel is retained." *Stearnes v. Clinton*, 780 S.W.2d 216, 221–22 (Tex. Crim. App. 1989). After appointment, "the trial court cannot arbitrarily remove [an] attorney of record over the objections of the defendant and counsel." *Id*. at 225 (holding that it was error to discharge appointed counsel on the ground that he tried to interview a witness, which was against the District Attorney's rule, which "is tenuous and in actuality is a legal nullity"). This is not to say that a trial court can never discharge an appointed attorney over objection; it just cannot do so arbitrarily or without

---

[10] Burgos-Aviles's counsel clarified at oral argument that he is not asserting that the trial court erred by not discharging Pena. He only challenges the discharge of Martinez.

9

"extraordinarily good cause." *Id.*; *Ex parte McFarland*, 163 S.W.3d 743, 759 (Tex. Crim. App. 2005). The trial court's decision must be for "some principled reason" not based on the trial judge's personal "feelings" and "preferences." *Buntion v. Harmon*, 827 S.W.2d 945, 949 (Tex. Crim. App. 1992) (en banc). We review the trial court's rulings for an abuse of discretion.[11] *Bluntson*, 2025 WL 1322702, at *23.

### (3) Application

It was clear to the trial court, as it is to us, that the relationship between Pena and Martinez became so contentious that the representation of Burgos-Aviles would suffer for it. The trial court stated that it could not allow both attorneys to continue representing Burgos-Aviles because it did not want to try the case a second time, recognizing that the conflict between them could open the door to ineffective assistance of counsel claims.

Burgos-Aviles compared his case to *Ex Parte McFarland*, 163 S.W.3d 743 (Tex. Crim. App. 2005), and argued that if the trial court in that case was not allowed to remove the first chair attorney who slept during portions of the trial, the reasons for removing Martinez in this case were also not sufficient. In *McFarland*, however, the trial court did not remove the defendant's attorney of choice; it honored the defendant's wish to keep his retained attorney, but to ensure competent counsel, it also appointed a second chair. *Id.* at 750. After conviction, the

---

[11] At oral argument, when questioned about the standard of review, Burgos-Aviles's counsel stated that the error was structural error. Indeed, if a trial court wrongfully discharges a defendant's attorney, the error is structural and reversible without the necessity of showing harm. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). However, that does not address the standard for finding of error in the first place. Discharge of a defendant's attorney over his objection is not error in every instance; the court of appeals must review whether the reasons for the discharge constituted extraordinarily good cause. *Stearnes v. Clinton*, 780 S.W.2d 216, 226 (Tex. Crim. App. 1989) (en banc) (holding that the removal of defendant's attorney was error "under the circumstances of this case"); *Love v. State*, 600 S.W.3d 460, 484–85 (Tex. App.—Fort Worth 2020, pet. ref'd) (holding that the trial court's order disqualifying defendant's attorney was an abuse of discretion and then because the error was structural, reversing without a harm analysis).

defendant challenged the competence of his chosen counsel. He claimed he had been denied counsel or, in the alternative, provided ineffective assistance of counsel. *Id*. at 752–53. The Court of Criminal Appeals recognized that the decision to appoint a second chair was because "[t]he trial judge was caught between Scylla and Charybdis" in trying to ensure both the right to competent representation and the defendant's right to counsel of his choice. *Id*. 759–60. The Court was not, as in this case, reviewing an order removing counsel and it did not hold that it would have been error for the trial court to make such a ruling.

Here, where the relationship between Pena and Martinez appeared to be irreparable, there was extraordinarily good cause to remove one of the appointed attorneys. Faced with the choice of discharging Pena, the lead counsel, or Martinez, the second chair, the trial court chose to discharge Martinez. If Burgos-Aviles had been charged with a crime that did not require the appointment of two attorneys who had to meet special qualifications, we may have agreed with him that the trial court, having to discharge one attorney, did not have the authority to decide which one. But, in this case, discharging Pena would have left Burgos without a lead counsel until another attorney qualified for death penalty cases could be found, appointed, and had a chance to review all that had happened to date. On this record, we hold that it was not an abuse of discretion for the trial court to discharge and replace Martinez.

We overrule Burgos-Aviles's first issue.

## B. The trial court did not abuse its discretion by denying Burgos-Aviles's motion to change venue.

Burgos-Aviles argues that the trial court abused its discretion by denying his request to change the venue of his trial to Bexar County.

**(1) Motion to change venue**

Burgos-Aviles filed a motion to change venue asserting that he could not receive a fair trial in Webb County "[d]ue to inflammatory online discussion, significant media attention, and the notoriety of [his] case in both Webb and Zapata counties[.]" He attributed the bias to "the media environment in the Laredo area." He further contended that the prejudice was compounded because his case was often discussed in the news in tandem with that of Juan David Ortiz, another border patrol agent charged and convicted of capital murder.

At the February 2023 hearing on the motion, Burgos-Aviles's only witness was Emily Shaw with Decision Analysis, which was "commissioned to investigate whether media coverage of Mr. Burgos-Aviles had created a bias among potential jurors of Webb County[.] Shaw reviewed a sample of 25 news articles and analyzed them for biased content; reviewed online comments to news stories posted on social media; and conducted a survey of 150 residents of Webb and Zapata counties and 150 residents of Bexar County, the county in which Burgos-Aviles requested his trial be held. According to the survey, 65% of the respondents from Webb and Zapata counties had heard of the case and believed Burgos-Aviles was guilty, compared to 28% of respondents from Bexar County. In analyzing the media, Shaw also considered comments on news articles posted on social media, which she says reveals bias and amplifies the media on which the comments were made.

The State called Oscar Hale as a witness. Hale is a former chief investigator for the District Attorney's office who has taken part in hundreds of jury selections, some of which were for high profile cases. Hale testified that after the initial coverage of the murders, the media only covered the case when there was a hearing. Based on his experience with juries, he believed that jurors always followed judge's orders and came to a verdict in accordance with the law and trial evidence,

12

not what they had heard on the news. Jamie Campos, a Laredo bar owner, also testified for the State that the news coverage of the case substantially slowed down after the initial reporting and that the later news stories would usually only give procedural updates on the case after a hearing. He said that his patrons, when they talked about the murders, mainly discussed the fact that it happened nearby and did not express their beliefs about Appellant's guilt. Finally, the State called Dr. Rick Morley as an expert witness on statistical research methods. He testified that Shaw used faulty methodology.

After the hearing, the trial court denied the motion.

### (2) Applicable law and standard of review

The constitutional right to due process includes the right to change venue "when a defendant demonstrates his inability to obtain an impartial jury or a fair trial at the place of venue." *Willingham v. State*, 897 S.W.2d 351, 357 (Tex. Crim. App. 1995) (citing *Groppi v. Wisconsin,* 400 U.S. 505, 510–11 (1971)). A defendant charged with a felony may file a motion for a change of venue. Tex. Code Crim. Proc. Ann. art. 31.03(a).[12] The motion must be supported by the defendant's own affidavit and that of at least two credible individuals who reside in the county where the case is filed. *Id*. He must show "[t]hat there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."[13] *Id*. art. 31.03(a)(1). This can be done "in a myriad of ways," including by offering "newspaper accounts of the crime, video or television coverage, audio portions from tape recorded interviews or radio programs, [] witnesses from the community, . . . [or] results of a statistical survey of

---

[12] We note that although the Legislature repealed Article 31.03, it was effective until January 1, 2025. Act of May 19, 2023, 88th Leg., R.S., ch. 765, § 1.001, sec. 31.01 2023 Tex. Gen. Laws 1837, 1881 (effective January 1, 2025).

[13] A defendant can also ask for a change of venue on the ground "[t]hat there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." Tex. Code Crim. Proc. Ann. art. 31.03(a)(2). Burgos-Aviles did not ask for a change of venue on this ground.

community sentiment by a pollster." *Wyle v. State*, 777 S.W.2d 709, 713 (Tex. Crim. App. 1989) (en banc). When, as in this case, the request to change venue is based on media coverage, the defendant "must show that the publicity was pervasive, prejudicial, and inflammatory." *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). Even "[w]idespread publicity" does not by itself entitle a defendant to a change of venue. *Sandoval v. State*, 665 S.W.3d 496, 508 (Tex. Crim. App. 2022). "The defendant must show an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Id.* A trial court's ruling on a motion to change venue is reviewed for abuse of discretion and will be affirmed if it is "within the zone of reasonable disagreement." *Id*.

### (3) Application

Shaw admitted that she did not "conduct an analysis specifically on the pervasiveness of the media coverage itself," one of the factors necessary to change venue, and instead "looked at the effects of that potential coverage on the population." She believed that the evidence of pervasiveness was that there was "a high level of awareness and familiarity with the case." However, of the 25 articles that were reviewed by Shaw and were before the court, almost half were from April 2018, the month of the murders. The remaining 14 articles, published over the next almost five years before the hearing, were "sporadic" and six of those were primarily about Ortiz, the other border patrol agent also charged with multiple murders and only referenced Appellant. Furthermore, some of the later articles that were about Appellant were "short updates on the status of [Appellant's] case, such as his request for a trial extension or gag order." *Colone v. State*, 573 S.W.3d 249, 257 (Tex. Crim. App. 2019) (considering the decrease in media coverage after the initial publicity).

14

As for the comments on social media, Shaw testified to some examples from the 111 comments on an article posted on Facebook by Laredo Morning News.[14] Only a part of the comments is included in the record, and not all are negative for Burgos-Aviles. For example, the top comment states, "To begin with he is not guilty yet. He is being accused of the murders but not proved yet."

Aside from the pervasiveness factor, Burgos-Aviles also did not show that the media was prejudicial or inflammatory, the other two required elements for a change of venue based on media coverage. "News stories, be it from print, radio, or television, that are accurate and objective in their coverage, are generally considered by this Court not to be prejudicial or inflammatory." *Gonzalez*, 222 S.W.3d at 451. On appeal, Burgos-Aviles does not argue that anything in the news stories that were admitted was prejudicial or inflammatory; instead, he points to the inflammatory comments to news posted on social media. As discussed above, the record does not contain all the comments or describe the percentage that expressed opinions about guilt. Based on this record, we hold that it was not an abuse of discretion for the trial court to find that the publicity was not so pervasive, inflammatory, and prejudicial as to warrant a change of venue.

On appeal, Burgos-Aviles also contends that the number of jurors who had previously heard about the case (14 of the 15 seated jurors) is evidence that the publicity was pervasive. *Gonzalez*, 222 S.W.3d at 449 (stating that voir dire is one of the "primary means of discerning whether publicity is pervasive). First, Burgos-Aviles did not reurge his motion at any time during voir dire. *Hathorn v. State*, 848 S.W.2d 101, 109 (Tex. Crim. App. 1992) (en banc) (noting that the motion to change venue was not reurged during voir dire); *Willingham*, 897 S.W.2d at 357; Tex. Code Crim. Proc. Ann. art. 28.01 ("if [motion to change venue] overruled at the pre-trial

---

[14] Burgos-Aviles's motion to change venue also cites a Facebook post by a "muckraking citizen journalist" that had 628 comments. We cannot locate the post or comments in the record and the motion quotes only 13 of the comments.

15

hearing, may be renewed by the State or the defendant during the voir dire examination of the jury"). But, even if he had, the record does not show that the jurors were biased due to media. The jurors that were seated were generally asked if they had heard about the case in the news or social media but were either not asked if they had formed an opinion on Burgos-Aviles's guilt or stated that they would be able to reach a verdict based only on the evidence.

A defendant can ask for a change of venue when there is "so great a prejudice against him that he cannot obtain a fair and impartial trial." Tex. Code Crim. Proc. Ann. art. 31.03(a)(1).[15] The statute does not prescribe that publicity be the source of the prejudice. Burgos-Aviles argues that the trial court erred by completely disregarding the results of the survey which, he says, is evidence of a bias regardless of the reason for the bias. That evidence, though, was contested. The State's expert witness on statistics testified that without a stated confidence interval, survey results have no value because they cannot be generalized to the population. He also testified that the comparison of survey results between Bexar County and Webb and Zapata counties is not useful because different methodologies were used (online surveys for Bexar and telephone surveys for Webb and Zapata). The trial court, as factfinder at this hearing, could credit the State's expert over the defense's. *Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co.*, 706 S.W.3d 362, 374 (Tex. App.—Houston [14th Dist.] 2022, pet. filed) ("The court is free to credit one expert over another, or one witness over another[.]").

The trial court's denial of the motion to change venue was within the zone of reasonable disagreement and not an abuse of discretion. We overrule Burgos-Aviles's second issue.

---

[15] We note that although the Legislature repealed Article 31.03, it was effective until January 1, 2025. Act of May 19, 2023, 88th Leg., R.S., ch. 765, § 1.001, sec. 31.01 2023 Tex. Gen. Laws 1837, 1881 (effective January 1, 2025).

**C. The trial court erred in admitting evidence of D.A.H.'s leg injury; however, the error was harmless.**

Burgos Aviles argues that the trial court erred in admitting evidence that the State argued showed that Burgos-Aviles tried to kill D.A.H. 15 days before the murders by injecting him with an unknown substance.

**(1) Motion to preclude extraneous offense evidence**

Burgos-Aviles filed a motion to preclude the introduction of the evidence on the basis that the State had not given him notice of its intent to use such evidence in accordance with the trial court's scheduling order and Rule 404(b). *See also* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (requiring similar notice for the sentencing phase).

Under Texas Rule of Evidence 404, evidence of "a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). Nonetheless, in criminal cases, such evidence is admissible if it is "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). To use evidence of uncharged conduct, "[o]n timely request by a defendant in a criminal case, the *prosecutor must provide reasonable notice* before trial that the prosecution intends to introduce such evidence—*other than that arising in the same transaction*—in its case-in-chief." *Id.* (emphasis added). The dispute here is whether the evidence of D.A.H.'s injury arose in the same transaction as the murders. If it did, then the State was not required to give notice of its intent to present the evidence at trial.

After a pretrial hearing on Burgos-Aviles's motion, the trial court agreed with the State that the evidence of the incidents of March 25 and D.A.H.'s injury were same-transaction contextual evidence and could be admitted without prior notice.

17

### (2) Preservation of error

The State argues that Burgos-Aviles did not preserve his complaint for appeal because the trial court ruled only that the *notice* was not required, and Burgos-Aviles did not object to *admissibility* when the evidence was introduced at trial. But, Burgos-Aviles's argument both in the trial court and on appeal is that the evidence was inadmissible *because* he was not given notice, an issue which turns on whether the trial court's characterization of the evidence as same-transaction evidence is correct. Burgos-Aviles's objection to the lack of notice and ruling on the failure to give notice sufficiently preserves his complaint for appeal. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

### (3) Applicable law and standard of review

The Court of Criminal Appeals has explained the difference between same-transaction contextual evidence and other extraneous offense evidence by its connection to the charged offense:

> Under Rule 404(b), [] same transaction contextual evidence is admissible only to the extent that it is necessary to the jury's understanding of the offense. It is admissible only when the offense would make little or no sense without also bringing in the same transaction evidence. That is, it is admissible when several offenses are so intermixed or connected as to form a single, indivisible criminal transaction, such that in narrating the one, it is impracticable to avoid describing the other.

*Id.* at 577 (internal quotation marks omitted).

The State argued that the evidence was contextual and part of the same transaction as the murders because it was necessary to explain the offense:

> [y]ou can't tell the story . . . in this case, without getting to how this happened; how they met on Facebook; how she got pregnant; how he was absent until the baby was -- was a year and eight months. And then she files . . . asking for financial support and help. And then . . . this first visit with the baby.

We disagree. The March 25 incident and the April 9 murders were not "indivisible." They were separate incidents that could have been charged and tried separately. The jury could understand all the evidence supporting the murder charges without knowing about the alleged prior attempt to murder D.A.H. The State argues that under Rule 404(b), the evidence would be admissible as evidence of "motive, opportunity, intent, preparation, plan, and knowledge," as argued by the State in its brief. That may be true, but as it is not same-transaction contextual evidence, to introduce it for any admissible purpose, the State was required to give Burgos-Aviles notice. Because the evidence of D.A.H.'s injury on March 25 was not contextual, same-transaction evidence, it was error for the trial court to rule that notice was not required for the evidence to be admissible.

### (4) Harm analysis

Burgos-Aviles asserts the harm analysis that applies is the analysis used for the improper admission of evidence, citing *Gonzalez v. State*. 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (considerations in analyzing harm are "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error."). But, when objection is to the lack of notice, which was the basis for Burgos-Aviles's motion to preclude the evidence, "we look only at the harm that may have been caused by the lack of notice and the effect the lack of notice had on the appellant's ability to mount an adequate defense."[16] *McDonald*, 179 S.W. 3d at 578.

Despite the lack of notice, Burgos-Aviles was prepared to defend against the allegations. He presented Facebook messages that were evidence that D.A.H. was sick before the meeting at

---

[16] At the hearing on the motion to preclude the evidence, Burgos-Aviles also raised objections on the grounds of relevance and that the probative value was outweighed by the danger of unfair prejudice. However, on appeal he makes no argument for their exclusion on these grounds.

Winfield Park on March 25. Burgos-Aviles also presented medical records showing that he had been prescribed testosterone injections to explain why he had hypodermic needles in his possession. Finally, he was able to introduce evidence through cross-examination of the pediatrician and the medical examiner that all the diagnoses after D.A.H.'s injury were that he was bitten by an insect.

Because the lack of notice did not prevent Burgos-Aviles from mounting a defense, it was harmless error to allow the evidence. We overrule his third issue.

### D. The trial court did not abuse its discretion in denying a mistrial.

In his fourth issue, Burgos-Aviles argues that the trial court erred in denying a mistrial after a witness's emotional statement and an outburst from the audience.

### (1) Emotional outbursts

During cross-examination of Border Patrol Agent Francisco Lara, defense counsel asked him whether the initial statement that he gave to the police was before he learned that Burgos-Aviles was a suspect. Lara launched into an unobjected-to narrative about learning that Burgos-Aviles was possibly the father of the dead child, during which he described his emotional reaction despite the trial court's attempts to stop his answer:

> Witness: That's when everything just -- I broke down is the word. Everything just—I felt like this weight on my shoulder, and I started crying. Because there I am thinking. . . .
>
> Court: Wait—wait for the next question, sir.
>
> Witness: Excuse me.
>
> [Defense counsel]: Should we take a break, Your Honor?
>
> Witness: I'm good sir. Here I am thinking we're supposed to be the good guys. He's supposed to be watching my back.
>
> [Unidentified audience members]: (Unintelligible).[17]

---

[17] According to defense counsel, the audience member said, "Thank you, yes, exactly" and there was loud sobbing. The State has not disputed this.

Court:      Hold on. Give me one second.

Witness:    And I broke. I—I was heartbroken. (Witness crying).

Court:      Give me a second, Agent. Just go on a question/answer basis, Mr. Boggs
            [defense counsel].

Witness:    I'm good, sir. Thank you, Your Honor. was heartbroken.

At that point, the trial court announced a recess, and the defense moved for a mistrial. The

trial court denied the mistrial, but as soon as they returned, instructed the jury to disregard the

emotional testimony:

> I am now instructing you [] that the opinion given by the witness with regard to
> who they are, and what they stand for, and whatnot . . . will be disregarded by this
> jury; . . . when the time comes to make a decision on this case, that you will not
> take that into account, or factor that in in any manner when making a decision on
> whether this defendant is guilty or not guilty of this crime that he is accused of by
> the grand jury in this State.
>
> You are not allowed to . . . weigh [it] in your consideration or mention it during
> your deliberations. . . . The only thing is evidence that comes from here, not what
> comes from out there, from the gallery.
>
> You will disregard any comments that you may hear, or outbursts that you may hear
> as a result of that. You will not allow any of that to weigh in when evaluating []
> whether or not a defendant is guilty or not guilty. I'm instructing you, in fact, to
> therefore not do so when the time comes. Thank you.

The trial court also advised the audience to "refrain from comments" to avoid the possibility of

having to retry the case.

### (2) Applicable law and standard of review

We review the denial of a mistrial for an abuse of discretion and will uphold the ruling so

long as it "was within the zone of reasonable disagreement." *Coble v. State*, 330 S.W.3d 253, 292

(Tex. Crim. App. 2010). Outbursts during trial, whether they are from witnesses or the audience,

are not grounds for reversal "unless the defendant shows a reasonable probability that the conduct

interfered with the jury's verdict." *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985);

*Coble*, 330 S.W.3d at 292. When reviewing the denial of a mistrial, we consider "(1) the prejudicial

effect; (2) the curative measures taken; and (3) the certainty of conviction absent the prejudicial event." *Jimenez v. State*, 298 S.W.3d 203, 213 (Tex. App.—San Antonio 2009, pet. ref'd) (quoting *Mosley v. State*, 983 S.W.2d 249, 259) (Tex. Crim. App. 1998) (en banc).

### (3) Application

#### (a) Prejudicial effect

Burgos-Aviles tries to distinguish this case from others in which the denial of a mistrial was upheld, arguing that Lara's comment "we're supposed to be the good guys" was an inappropriate comment that Burgos-Aviles was guilty. Burgos-Aviles cites two cases in which one of the reasons given by the court of appeals in upholding the denial of a mistrial was that the outburst was not a comment on guilt. *Cantu v. State*, No. 08-23-00304-CR, 2024 WL 3611164, at *12 (Tex. App.—El Paso July 31, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that the trial court was not required to grant a mistrial when the victim's mother's sobbed in the gallery because, among other reasons, the "emotional 'outburst' did not include an opinion regarding defendant's guilt or his defensive claim"); *Ashley v. State*, 362 S.W.2d 847, 853 (Tex. Crim. App. 1962) (holding that a victim's widow's outcry during closing argument was not prejudicial because it had "no bearing" on the murder or claim of self-defense). Whether the statement is accusatory or indicates a belief in guilt may be a consideration, but it is not determinative. Courts have many times held that a witness's outburst is not overly prejudicial even when the witness clearly indicates that they believe the defendant is guilty. *See, e.g.*, *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (family member of the victim shouted from the gallery, "You did this for 200 dollars?"); *Coble*, 330 S.W.3d at 291 (witness called the defendant an "[e]vil piece of shit"); *Batts v. State*, No. 14-24-00189-CR, 2025 WL 1936577, at *1–2 (Tex. App.—Houston [14th Dist.] July 15, 2025, pet. ref'd) (mem. op., not designated for

publication) (witness, victim's mother, shouted at defendant "I hate you. I hate you. Why you do that to my baby?"); *Jimenez*, 298 S.W.3d at 213–14 (upholding the denial of a mistrial when the witness, without being asked a question, stated "Well, I got to say it. Mr. Jimenez planned the murder."). Moreover, Lara's statement was more an explanation of why he "broke down" when he learned Burgos-Aviles was a suspect than a statement of belief that Burgos-Aviles was guilty.

### (b) Curative measures

In addition, the trial court took immediate steps to cure whatever prejudice the testimony and outburst caused by instructing the jury to disregard Lara's and the audience's statements. We must assume that the jury followed those instructions. *Coble*, 330 S.W.3d at 292 (A trial court's instructions to the jury to disregard such outbursts "are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions."). The State did not mention or try to capitalize on the outbursts during its closing argument. *Id.* at 293 (listing this as a consideration in determining if prejudice was incurable).

Burgos-Aviles also argues that the prejudice was incurable because of the cumulative effect of Lara's statements together with the outburst from the audience. However, the very nature of the charges—the murder of a young mother and her baby—were very emotional, and it is reasonable to assume that the jury understood that Grizelda and D.A.H.'s friends and family in the audience would be upset and emotional listening to the evidence. *Jimenez*, 298 S.W.3d at 213–14 ("The jury could have reasonably recognized this comment as the obviously biased opinion of the victim's mother.").

### (c) Certainty of conviction

Finally, based on all of the evidence linking Burgos-Aviles to the murders—for example, his relationship with Grizelda and motive to keep it secret, his plan to meet with her that day at the

23

park, and the cell phone and GPS data showing that he had Grizelda's phone after the murders—it is highly unlikely that the brief expression of emotion by Lara and the audience on one occasion influenced the jury's verdict.

Neither Lara's comments about his emotional reaction nor the audience's response created such incurable prejudice that it interfered with the jury's verdict. We hold that the trial court did not abuse its discretion in denying the mistrial. Appellant's fourth issue is overruled.

### E. The trial court did not err in allowing expert testimony on location data from cell phones.

In his final issue, Burgos-Aviles argues that the trial court erred in allowing the State's expert witness to testify about the location of Burgos-Aviles and Grizelda's phones based in part on cell phone tower data.

#### (1) Motion to exclude expert testimony

Prior to trial, Burgos-Aviles filed a motion to preclude the testimony of Andrew Masters, the State's expert witness on cell-site location data. In his motion, Burgos-Aviles questioned the reliability of the underlying data to determine the exact, rather than general, location of Burgos-Aviles and Grizelda's phones based on which tower connected to the cell phone. He argued that a cell tower can service a cell phone that is twenty, or sometimes more, miles away and that cell phones do not always connect to the closest tower for a variety of reasons.

During trial but out of the presence of the jury, the trial court conducted a hearing on Burgos-Aviles's motion. Tex. R. Evid. 705(b) (requiring the trial court in a criminal case to permit a party to examine the expert outside of the presence of the jury about the underlying facts and data). Both Masters and Manfred Schenk, the defense expert on cell-site analysis, testified at the preliminary hearing. Masters, an FBI agent with the Cellular Analysis Survey Team (CAST) testified that for his analysis, he used a variety of sources. He used call detail records which show

24

which cell towers were used by the cell phone, the timing advance report for Burgos-Aviles's phone[18], surveillance video, google location data (which itself consists of three types of data—cellular, Wi-Fi and GPS), and GPS reports from the Motorola radio in Burgos-Aviles's border patrol truck.

Masters explained that the timing advance report, also called the per call measurement data or PCMD, provides more accurate location data than the call detail records. A timing advance report does more than show which tower the phone connected to; it determines the distance the phone was from the tower by calculating how long it took for a signal to travel from the tower to the cell phone and back to the tower. What results is a geographic area in the shape of an arc, and the location of the phone is on the line of the arc or slightly inside of it. So, while call detail records place the phone anywhere within the (sometimes large) coverage area of a tower, timing advance reports narrow the location to a small arc within the coverage area.

Masters testified that he was able to determine a general location using the call detail records and timing advance report. He then verified the accuracy of that location with the Google Wi-Fi and GPS location data,[19] Motorola GPS records, and surveillance videos confirming that Burgos-Aviles was in the area shown in the cell phone records. Based on all those records, his opinion was that Burgos-Aviles and Grizelda's phones were at the crime scene at the time of the murders, then travelled to a different location in Laredo, and then back to the murder scene.

Schenk, the defense expert, disagreed that the timing advance reports produced reliable evidence of a phone's location. In addition to providing data about the distance of the phone from the tower, a timing advance report also includes latitude and longitude. Schenk testified that by

---

[18] AT&T, Grizelda's cell service provider, did not provide timing advance reports for the time of the murders.

[19] Masters said he did not use the Google cellular data because its radius is too large to provide reliable information of location.

using the latitudes and longitudes given in the timing advance report for Burgos-Aviles's phone and the time that the phone was supposedly at each location, he found more than 5000 errors and almost 7000 improbabilities in the timing advance data. Masters agreed that the latitude and longitude provided in the timing advance report is inaccurate and is only the "networks' best guess at the specific location" of the phone along the arc determined by data. Masters stated that in determining location, he does not use the latitude and longitude in the timing advance report and only uses the distance information, which is "highly accurate," to determine the arc that the phone is in.

Aside from the call detail records and the timing advance report, Schenk did not review any of the other sources of information that Masters relied on. He stated, "To the extent that there is other information available, I have no position on, and I don't know to what extent [Masters] . . . relied upon it." Although he did not review the Google data, Schenk testified that it should not be relied upon because Google uses a "proprietary algorithm" and neither he nor anyone else can test its conclusions. At the same time, he stated that the source of the Google Wi-Fi information is the Global Positioning Network which is "highly accurate."

### (2) Applicable law and standard of review

A qualified expert "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. The trial court acts as a gatekeeper and, before an expert is allowed to testify to a jury, the court must decide whether the expert is qualified and the evidence is reliable and relevant. *Coble*, 330 S.W.3d at 272 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90 (1993)).

In determining whether scientific evidence is reliable, courts look at a variety of factors, which can include the following:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (en banc). However, these factors may not apply to expert testimony in "fields based primarily upon experience and training as opposed to scientific methods"—what the courts have labeled as "soft" sciences. *Allison v. State*, 666 S.W.3d 750, 759 (Tex. Crim. App. 2023); *Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999) (en banc). We review the admission of expert testimony for an abuse of discretion. *Coble*, 330 S.W.3d at 272.

### (3) Application

Burgos-Aviles challenges the admissibility of the cellular location evidence on three grounds. He argues that the State failed to establish (1) that the methodology used by Masters and CAST has been accepted by the relevant scientific community; (2) that the methodology has been subject to testing and peer review; and (3) that the underlying data used by Masters to draw his conclusions was reliable.

### (a) Accepted methodology

As recently recognized by the Tyler court of appeals, Texas courts have generally accepted the reliability of "expert testimony about cell phone mapping, as well as maps created using cell phone geolocation data[.]" *Nyabuto v. State*, No. 12-24-00026-CR, 2025 WL 1338077, at *13

(Tex. App.—Tyler May 7, 2025, pet. ref'd) (mem. op., not designated for publication) (citing *Wells v. State*, 675 S.W.3d 814, 829 (Tex. App.—Dallas 2023), *aff'd*, 2025 WL 980996 (Tex. Crim. App. Apr. 2, 2025); *Trevino v. State*, No. 05-19-00295-CR, 2020 WL 2537246, at *8 (Tex. App.—Dallas May 19, 2020, no pet.) (mem. op., not designated for publication); *Woodruffe v. State*, No. 01-22-00327-CR, 2023 WL 4873191, at *8 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, pet. ref'd) (mem. op., not designated for publication); *Patrick v. State*, No. 05-18-00435-CR, 2018 WL 3968781, at *30 (Tex. App.—Dallas Aug. 20, 2018, no pet.) (mem. op., not designated for publication); *Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at *10 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op., not designated for publication)); *see also Hollins v. State*, No. 01-22-00776-CR, 2024 WL 4982504, at *17 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, no pet.) (mem. op., not designated for publication).

Nonetheless, Burgos-Aviles argues that the methodology is not accepted because "cell site analysis cannot be used to identify specific or exact locations" and can "only determine a general geographic area[.]"However, he also recognizes that courts admit such evidence "where an expert makes clear that the mapping technology lacks the ability to pinpoint a defendant's exact location." *United States v. Kemp*, No. 4:15-cr-00025-TWP-VTW, 2017 WL 2719328 (S.D. Ind. 2017); *United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016).

Masters acknowledged the limitations of the data from call detail records. In the Rule 702 hearing, he stated that with only those records, he is "constrained to say that the phone was somewhere within the footprint or this coverage area of a particular cell site" and that all he can conclude is that the "cell phone is within the coverage area of the cell tower that was used." He also explained that the coverage area of cell towers in Laredo can extend anywhere from a mile and a half to four miles from the tower. Masters was also clear in his testimony to the jury that

28

with cell tower data, he could only determine the "general location of a device by which cell tower and which cell sector was used" and that a phone communicating with a tower could be anywhere within that tower's coverage area. The maps that he created had shaded areas to show those coverage areas. Although he testified that he could start "pinpointing" the phone's location, that was only when he used other sources of information, such as timing advance reports.

Burgos-Aviles does not challenge the methodology to the extent it was used to show which tower the phone communicates with. Nor does he challenge that the tower information narrows the phone's location to the coverage area of the tower. At its core, his argument is really that the information is not helpful. A similar argument was made in *Thompson v. State*, 425 S.W.3d 480, 488 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). In that case, like here, the defendant argued that analysis of cell phone records to show location was not an accepted methodology because it could not provide evidence of a precise location. *Id*. at 488. The Court noted that "[t]he possibility that [defendant]'s mobile-phone communications could have in fact originated miles away from the antennas does not necessarily render the phone-related testimony unhelpful." *Id*. It was helpful to the jury in that case because it "showed that [defendant]'s mobile phone was active in the general vicinity of the murder scene, a location close to neither his home nor his employment, and that after the murder the phone communicated with antennas while travelling along the way to the vicinity of [defendant]'s residence." *Id*. at 489. The same is true here. Information from all sources (including Google data, surveillance videos and Motorola GPS data) showed that Burgos-Aviles's phone was at the park at the time of the murders, left the park afterwards and travelled to Burgos Aviles's home, and then returned to the park. Although the only data from Grizelda's phone were the call detail records which could only narrow the phone's location down to the coverage area of the tower, that information was nevertheless helpful to the jury. It showed that after she was killed,

29

her phone travelled outside of the coverage area of the towers in that area and did so at the same time as Burgos-Aviles's phone. Therefore, while the call detail records could not confirm the exact location of Grizelda's phone, they provided enough information to show that, after her murder, the phone moved to a different location that was consistent with the movement of Burgos-Aviles's phone.

We hold that the methodology used by Masters was accepted and that his testimony was clear that information about what towers the phones used could not provide their exact location.

### (b) Testing and peer review

Burgos-Aviles also maintains that the trial court erred because the State failed to show that the methodology has been subject to testing and peer review. But, as discussed above, the admissibility of nonscientific expert evidence "is held to a less rigorous standard than hard science testimony." *Allison*, 666 S.W.3d at 759. Cell phone mapping has been recognized as a soft science and a "relatively simple task of mapping the general location[.]" *Alyea v. State*, No. 14-19-00498-CR, 2021 WL 5117972, at *3 (Tex. App.—Houston [14th Dist.] Nov. 4, 2021, pet. ref'd) (mem. op., not designated for publication) (citing *Thompson*, 425 S.W.3d at 489); *Robinson v. State*, 368 S.W.3d 588, 601 (Tex. App.—Austin 2012, pet. ref'd)); *see also*; *Hollins*, 2024 WL 4982504, at *17. "[H]ard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences." *Nenno*, 970 S.W.2d at 561.

Furthermore, the data *was* tested, although not in the same sense that scientific data are tested. Masters conducted drive tests to personally determine the coverage area of towers. And he verified the cell site data with other sources—surveillance video, Google data, and GPS data from the Motorola radio. *Hollins*, 2024 WL 4982504, at *18 (explaining that the detective used other

information to "independently corroborate" the cell phone data); *Nyabuto*, 2025 WL 1338077, at *13 ("[The expert]'s use of other evidence in this case to independently corroborate the cell phone location data further supports the trial court's finding of reliability."); *Alyea*, 2021 WL 5117972, at *4 ("The detective also indicated that he checked his results through other evidence he collected in the case, such as the surveillance video . . . [and] witness statements about where the appellant or one of the complainants were at different times on the night of the murders.").

We hold that scientific testing and peer review was not required for the cell phone evidence to be admissible.

### (c) *Reliability of underlying data*

Burgos-Aviles argues that the underlying data was unreliable because Sprint made disclaimers that it was "unable to certify or testify to the accuracy" of the timing advance records and that they were "not created as a tool to identify customer location." However, that same disclosure also recognized that timing advance records have "been used [to identify customer location] as it is a Sprint record that could possibly lead to customer location."

First, Masters agreed that some of the timing advance data, namely the latitude and longitude, are not accurate, and he testified that he does not use that part of the records. Second, as we have already said, he corroborated the data with other evidence of location. Third, he testified that the accuracy is verified because, using similar records, the FBI has consistently and often found fugitives, victims, and missing people. For instance, he said that "not a week [] goes by that we have not located a missing child[.]"

But more importantly Burgos-Aviles's complaints go to the weight of the evidence rather than its admissibility. "The reliability of underlying facts or data turns on whether the data provides a sufficient basis to support the opinions." *Null v. State*, 690 S.W.3d 305, 312 (Tex. Crim. App.

31

2024). And "[w]hether there is a sufficient basis is a quantitative rather than a qualitative analysis."[20] *Id.* The Texas Court of Criminal Appeals explained the difference between qualitative and quantitative by quoting a federal district court opinion:

> The witness' testimony that he or she obtained a measurement of . . . distance is sufficient to satisfy the "facts and data" element of Rule 702 for that component of the methodology. Whether the witness obtained the measurement with a precision laser, with a household yardstick, or by roughly pacing off the distance on foot is irrelevant to the Rule 702 analysis. Such challenges bear on the quality, not the quantity, of the data obtained by the witness and thus, bear only upon the weight that should be afforded the witness' opinion at trial.

*Id.* at 313 (quoting *United States v. Crabbe*, 556 F.Supp.2d 1217, 1223 (D. Colo. 2008)).

Here, Burgos-Aviles does not argue that Masters did not have *enough* data from which to form an opinion. His argument is instead that the data does not provide specific enough information. This is a qualitative challenge and, as in the example above, goes to the weight, not admissibility, of Masters' opinion. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596; *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("[A]n expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.")). In cross-examination, Burgos-Aviles did in fact question Masters about the Sprint disclaimer and the disclaimer was admitted into evidence. The jury could consider Sprint's disclaimer to the accuracy of the data when weighing the evidence. We hold that the underlying data was reliable.

---

[20] This is a different question than whether "experts in the particular field would reasonably rely on those kinds of facts or data" Tex. R. Civ. P. 703; *Null v. State*, 690 S.W.3d 305, 314 (Tex. Crim. App. 2024). Burgos-Aviles does not argue on appeal that timing advance data is not reasonably relied on in this field.

The trial court did not abuse its discretion in allowing testimony and evidence about the cell phone locations. We overrule Burgos-Aviles's fifth issue.

## III. CONCLUSION

The judgment and conviction of Burgos-Aviles is affirmed.

MARIA SALAS MENDOZA, Chief Justice

November 25,2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)